**E.**

Given our affirmance of the district court's rulings, we need not reach the issues raised in March's cross-appeal.

**III.**

The district court's order that the children be immediately returned to their father in Mexico is **AFFIRMED,** and our prior order issuing a stay of the district court's order pending resolution of these appeals is **VACATED.**  Because Samson and Tzipora have been separated from their father for almost one year now, we further order that our mandate issue forthwith pursuant to Fed. R. App. P. 41(a), and that the district court take appropriate action to ensure that the children are reunited with their father with all due speed.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0126P (6th Cir.)
File Name:  01a0126p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

PERRY A. MARCH, in his
capacity as father of SAMSON
LEO MARCH and TZIPORA
JOSETTE MARCH, both minor
children,
            *Petitioner-Appellee/*
            *Cross-Appellant,*

            *v.*

LAWRENCE E. LEVINE;
CAROLYN R. LEVINE,
        *Respondents-Appellants/*
        *Cross-Appellees.*

Nos. 00-6326/6551

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 00-00736—Aleta A. Trauger, District Judge.

Argued:  March 14, 2001

Decided and Filed:  April 19, 2001

Before: KENNEDY and SUHRHEINRICH,[*] Circuit Judges; GAUGHAN, District Judge.

_____

**COUNSEL**

**ARGUED:** Mark H. Levine, Los Angeles, California, for Appellants. John E. Herbison, Nashville, Tennessee, for Appellee. **ON BRIEF:** Mark H. Levine, Los Angeles, California, Gregory D. Smith, James G. Martin III, STITES & HARBISON, Nashville, Tennessee, for Appellants. John E. Herbison, Nashville, Tennessee, Robert S. Catz, Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge. This appeal involves the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610 (2000), which is a codification of the Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature*, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986) (hereinafter "Hague Convention"). The Hague Convention was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, pmbl.

Under the ICARA, a petitioner must establish by a preponderance of the evidence that his children were wrongfully removed or retained in breach of his custody

_____

[*] The Honorable Patricia A. Gaughan, United States District Judge for the Northern District of Ohio, sitting by designation.

provides a generous authentication rule. 42 U.S.C. § 11605 ("[N]o authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court."). Such a provision serves to expedite rulings on petitions for return of children wrongfully removed and retained. Expeditious rulings are critical to ensure that the purpose of the treaty – *prompt* return of wrongfully removed or retained children – is fulfilled. Hague Convention, art. 1.

We further note that courts in other Contracting States to the treaty have also upheld summary proceedings on review. For example, an Australian court has held that the Convention's primary purpose "is to provide a summary procedure for the resolution of the proceedings and, where appropriate, a speedy return [of children] to the country of their habitual residence." *In the Marriage of Gazi*, (1992) 16 Fam. L.R. 180, ¶ 9, *available at* http://scaletext.law.gov.au/html/famdec/0/92/0/FM000720.htm (last visited March 22, 2001). The Australian court therefore ruled that the trial court "properly adopted a summary form of procedure." *Id.* (opining that allowing cross-examination of deponents of affidavits may be appropriate in rare cases; noting that it was apparent that the trial court had considered all relevant material before it, including affidavits).

Finally, we note that although the district court ruled that it would decide the motions before it without discovery, it nonetheless entered a voluminous amount of evidence into the record from both parties. Indeed, over 1,300 pages were filed with the district court and made part of the record on appeal. Moreover, review of the district court's opinion reveals that the court carefully considered the evidence both parties offered and independently sought information on its own volition. In sum, given the unique nature of this treaty, we hold that the district court did not abuse its discretion when it granted summary judgment in favor of March prior to discovery or an evidentiary hearing.

treaty requires not only expeditious action by courts under article 11, as the district court properly noted, but use of "the most expeditious procedures available." Hague Convention, art. 2. Indeed, the drafters of the treaty stressed the emergency nature of these cases: "Its nature is one of emergency because it seeks a speedy and immediate solution to the cases involved." Elisa Pérez-Vera, *Report of the Special Commission*, *in* 3 Actes et documents de la Quatorzieme Session 172, 179 ¶ 25 (Permanent Bureau of the Hague Conference on Private International Law ed. and trans. 1980) (official English translation).[10]

In addition to the requirement of expeditious action, the treaty has a number of provisions to help ensure that return proceedings are handled in such a manner and that return of children to their country of habitual residence is likely. For example, the treaty sets forth generous rules regarding authentication of documents and judicial notice. Hague Convention, art. 14. The treaty further provides rights to petitioners when a decision is not rendered within a mere six weeks of filing their petition. Hague Convention, art. 11. Importantly, the treaty also provides that a court may order return of a child at any time, notwithstanding proof of treaty defenses. Hague Convention, art. 18 ("The provisions of this Chapter [pertaining to return of children] do not limit the power of a judicial or administrative authority to order the return of the child at any time.").

Likewise, the ICARA repeatedly uses the word "prompt" to describe the nature of proceedings for the return of a child wrongfully removed or retained. 42 U.S.C. § 11601(a)(4). Like the treaty itself, the implementing legislation also

[10]According to the Legal Analysis of the Hague Convention prepared by the Department of State, the Perez-Vera Report "is recognized . . . as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10,494, 10,503 (March 26, 1986); *see also Whallon v. Lynn*, 230 F.3d 450, 455 n.5 (1st Cir. 2000).

rights under the laws of the Contracting State in which the children habitually resided before they were removed or retained. Hague Convention, arts. 3, 12; 42 U.S.C. § 11603(e)(1)(A). Once wrongful removal is shown, the children must be returned. Hague Convention, art. 12. However, a court is not bound to order return of the children if the respondents establish certain exceptions under the treaty. Hague Convention, art. 13. The ICARA requires that a respondent establish by clear and convincing evidence the grave risk of harm exception under article 13(b),[1] and the protection of fundamental freedom provision of article 20.[2] 42 U.S.C. § 11603(e)(2)(A). Notwithstanding these exceptions, the treaty further provides that "[t]he provisions of this Chapter [pertaining to return of children] do not limit the power of a judicial or administrative authority to order the return of the child *at any time*." Hague Convention, art. 18 (emphasis added).

Respondents Lawrence E. Levine and Carolyn R. Levine ("the Levines"), the grandparents of two minors, Samson Leo March and Tzipora Josette March, appeal the order entered by the district court in this action under the ICARA and the Hague Convention which directed the Levines to immediately return the two minor children to their father in Mexico. Petitioner Perry A. March ("March"), the biological father of Samson and Tzipora, cross-appeals portions of the order decided adversely to him. We **AFFIRM** the district court's order, adopting its well-reasoned opinion. *See March v.*

[1]This exception provides that a court is not bound to return a child if the person opposing return establishes that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

[2]This provision states that return of a child "may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20.

*Levine*, ___ F. Supp. 2d ___, No. 3:00-0736 (M.D. Tenn. Oct. 4, 2000).

## I.

This case involves an American father who moved to Mexico with his two biological children, of whom he had custody. It also involves two American maternal grandparents who obtained court-ordered visitation rights, then removed the children from Mexico and returned with them to the United States, and then retained them after the end of the court-ordered visitation. The father seeks return of his children under the ICARA and the Hague Convention.

The mother of the children disappeared in 1996 and her parents, the Levines, believe she was murdered by her husband, March. This is the basis for the Levines' fervent belief that March should not have custody of their grandchildren. However, there have also been allegations that the maternal grandfather, Mr. Levine, killed his own daughter.[3] March has not been charged, nor apparently has anyone else has been charged, with the murder of the children's mother. The Levines were nevertheless successful in obtaining a default judgment as a discovery sanction against March in a wrongful death action which held that he killed his wife. March vehemently objects to being characterized as a killer and asserts that his wife disappeared, abandoning him and the children.

Additional facts are set forth in the district court's opinion. *March*, ___ F. Supp. 2d at ___, No. 3:00-0736.

On or about June 15, 2000, the Levines arrived in Jalisco, Mexico, to visit the March children pursuant to an *ex parte*

---

[3]This is acknowledged by the Levines. Final Br. on Behalf of Appellants at 28.

oral testimony or on affidavits. Fed. R. Civ. P. 43(e). Here, the court properly elected the latter.

However, these are not the only concerns at issue in this case. As the district court properly observed, the Hague Convention and the ICARA raise unique concerns:

> [T]his type of case is appropriate for resolution by summary judgment. Indeed, the language of the Convention supports resolution by such means. Article 11 provides that a court, when faced with a petition under the Convention, should "act expeditiously in proceedings for the return of children." Courts are to place these cases on a "fast track" in order to expedite these proceedings and carry out the purposes of the Convention.
> The language of the Convention also authorizes courts to "take notice directly of the law of, and of judicial and administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable."
> There is no requirement under the Hague Convention or under the ICARA that discovery be allowed or that an evidentiary hearing be conducted. Thus, under the guidance of the Convention and the statutory scheme, the court is given the authority to resolve these cases without resorting to a full trial on the merits or a plenary evidentiary hearing.

*March*, ___ F. Supp. 2d at ___, No. 3:00-0736 at 2-3 (citations omitted).

We agree. The petition for return of children at issue here is not a run-of-the-mill case that falls within the general rule so that it may be said that the district court abused its discretion. Rather, this case involves a petition under a unique treaty and its implementing legislation, neither of which expressly requires a hearing or discovery. In fact, the

a motion. Nevertheless, the Levines' motion sought discovery only to develop proof regarding the narrow issue of the children's habitual residence, not any of the treaty exceptions to return of the children or any other issue. Therefore, we review the issue raised only as it pertains to their discovery request.

"The general rule is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." *Vance*, 90 F.3d at 1148. "If the non-movant makes a proper and timely showing of a need for discovery, the district court's entry of summary judgment without permitting him to conduct any discovery at all will constitute an abuse of discretion." *Id.* at 1149. Thus, although *Vance* indicates that summary judgment is improper without discovery, it acknowledges that this is only a general rule.

At the same time, however, the plain language of Rule 56 "does not specifically require or even expressly authorize receipt of oral evidence and other types of evidence in a hearing setting." 11 James Wm. Moore et al., Moore's Federal Practice § 56.15[1][a], at 56-200 to 56-201 (3d ed. 2000). Moreover, "oral testimony is not favored in summary judgment proceedings due to the well founded reluctance to turn a summary judgment hearing into a trial." *Id.* at 56-202. Further, a court has discretion to hear evidence on motions by

---

because the plaintiffs did not comply with the requirements of the rule). The plain language of Rule 56(f) requires an affidavit that "the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed. R. Civ. P. 56(f). The Levines did not file a Rule 56(f) *affidavit*. They filed a *motion* for discovery. Moreover, although their motion contained a statement that it was signed and verified by the Levines "as an affidavit," the Levines did not sign the document. Thus, if Rule 56(f) requires an affidavit that explains why the party "cannot for reasons stated present by affidavit facts essential to justify the party's opposition," the Levines' argument about discovery as it pertains to the issue of habitual residence is not preserved for review. Nevertheless, because we are constrained to follow *Vance*, we assume the motion the Levines filed is sufficient to preserve this issue for review.

---

order entered by an Illinois court on May 17, 2000.[4] This Illinois order granted them a thirty-nine day period of uninterrupted visitation with Samson and Tzipora. Although the visitation order did not restrict the Levines' ability to travel with the children, the order did not authorize the Levines to remove the children from Mexico for visitation. The Levines obtained a Mexican court order giving effect to the Illinois visitation order, but the Mexican order explicitly required that the visitation occur in Guadalajara, Mexico. The Levines went to the children's school, accompanied by the Mexican judge and armed police, and took physical possession of the children pursuant to these orders on June 21, 2000. That same night, contrary to the Mexican court order, they left Mexico with the children and returned with them to Tennessee, where the Levines reside. There is an outstanding Mexican arrest warrant against the Levines and their adult son, who is also one of their attorneys on appeal, for the kidnapping of the children.

The Illinois court-ordered visitation period expired July 30, 2000. Since that time, the Levines have refused to return the children to their father in Jalisco, Mexico, where the children had resided for more than one year prior to their removal. Instead, the Levines have sought termination of March's parental rights and custody of their grandchildren by instituting proceedings in Tennessee.

March filed his Petition for Return of Children under the ICARA on August 3, 2000, asserting that they were wrongfully removed from their habitual residence in Mexico in violation of his custody rights and the Hague Convention. In addition to the return of his children, March requested that the district court expedite matters; enter a provisional order directing the Levines to return his children pending a hearing, or alternatively, that the court grant him immediate rights of

---

[4] March moved with his children from Tennessee to Illinois in 1996 after his wife's disappearance. Shortly after he relocated to Illinois, the Levines sought grandparent visitation there. In 1999, March relocated to Mexico.

access, including telephone contact with the children and a schedule for the children to have time with him until a hearing on the merits; that trial be set in advance of the children's school year; and other relief.

The Levines filed a sworn Answer on August 22, 2000. Among numerous defenses raised, the Levines asserted that March should be disentitled from bringing his petition before the court under the fugitive disentitlement doctrine. They also asserted that Mexico is not the habitual residence of the children, as required for the return of children under articles 3 and 12 of the Hague Convention. They further asserted exceptions to return of children under articles 13(b) and 20 of the treaty, i.e., that return of the children to March would present a grave risk of psychological and physical harm as well as place them in an intolerable situation, and that return of the children would violate human rights and fundamental freedoms. In addition, they asserted that full faith and credit were due to various state and Mexican court decisions under a variety of legal theories, including "abstention."

On August 30, 2000, March moved for summary judgment or partial summary judgment on the question whether the Levines wrongfully removed or wrongfully retained the children under the ICARA. The next day, the Levines moved to dismiss the petition based on March's inability to establish that Mexico was the children's habitual residence, and the fugitive disentitlement doctrine.

On September 1, 2000, the district court ruled that it would decide these pending motions prior to allowing any discovery. More than a month later, and after the court allowed a voluminous amount of evidence into the record in conjunction with the parties' briefs and independently sought information under the terms of the treaty,[5] the district court entered a fifty-

---

[5]The Hague Convention requires a court to consider social background information of the children provided by the Central Authority of the children's country of habitual residence. Hague Convention, art. 13. Here, the district court requested a variety of such information. It

be returned to their place of habitual residence so that custody determinations are made there. By invoking the treaty's exceptions in this case, what the Levines truly seek is a determination regarding the adequacy of March as a parent in light of his wife's disappearance. This falls squarely within the "forbidden territory" of deciding the merits of the parties' custody dispute. *Friedrich*, 78 F.3d at 1065. The district court properly recognized the Levines' argument for what it is, and declined to enter this forbidden territory.

## D.

The Levines argue that the district court erred when it granted summary judgment in favor of March without allowing discovery or an evidentiary hearing. They also complain that they were not allowed to develop their treaty defenses under articles 13 and 20 of the Hague Convention prior to the court's grant of summary judgment in favor of March.

We adopt the district court's opinion on this point also. We take a few moments to elaborate, however, since this is apparently a question of first impression.

We review for an abuse of discretion a claim that summary judgment was prematurely entered because additional discovery was needed. *Vance ex rel. Hammons v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996). However, such an argument is not preserved for appeal unless it is first advanced in the district court by the filing of an affidavit pursuant to Federal Rule of Civil Procedure 56(f), or by the filing of a motion for additional discovery. *Id.* (citing *Plott v. General Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995)). Assuming that a motion for discovery without an accompanying affidavit is sufficient,[9] the Levines filed such

---

[9]This Court has recently noted that the plain language of Rule 56(f) requires an affidavit, and that other Circuits have strictly construed the Rule. *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488-89 (6th Cir. 2000) (declining to address the issue whether an affidavit is necessary

the basis of the allegations contained in the Levines' pleadings. The default judgment declared Janet Levine March dead and that March killed her. Thus, the Levines never proffered evidence of their allegations in the state court proceedings. March, on the other hand, has averred in a sworn declaration that he did not kill his wife, that she drove away one evening, that there is no evidence of which he is aware that she is deceased, and that he is appealing the default judgment.

Even assuming that the default judgment would be upheld on appeal, that it should be given preclusive effect in these proceedings, and that it is sufficient to show that there is some risk of harm to the children in being returned to March, this default judgment is not clear and convincing evidence that there is a *grave* risk of harm to the children in being returned to their father. Our review of the record, like that of the district court, shows no allegations by the Levines over the many years that they pursued visitation with the children that March has harmed them or would harm them. Nor have the Levines made any showing of serious abuse much less neglect of the children by March. At best, the default judgment might raise a tenuous inference that he might hurt his children. Even that inference, however, does not rise to the level of an imminent risk of grave harm. Further, the children are not being returned to any other type of circumstances that would place them in imminent harm, such as to a war zone, or to an area of rampant disease or famine. The Levines also have not shown the Mexican authorities incapable of or unwilling to protect the children. Indeed, the Levines were successful in obtaining the assistance of the Mexican authorities to enforce a visitation order. This demonstrates that the foreign authorities will hear and consider the Levines' arguments should they seek relief under the visitation and custody laws of Mexico.

The Hague Convention and the ICARA were specifically designed to discourage those who would remove or retain children in the hopes of seeking a "home court advantage" by ensuring that children wrongfully removed or retained would

two page opinion and an order in which it granted March's petition and ordered the Levines to immediately return the children to him. Specifically, the district court held that March had met his burden of establishing wrongful retention. It further held that the Levines had not met their burden of showing exceptions to return of children under the treaty. In addition, it declined to disentitle March from bringing his petition. However, the court, in aid of appellate jurisdiction, stayed its order until October 10, 2000, or until further direction from this Court.

Both parties appealed. A panel of this Court ordered a temporary stay of the district court's order until the Levines filed a substantive motion seeking a stay. After the Levines filed such a motion, this Court granted a stay of the district court's order pending resolution of the instant appeal and cross-appeal.

Regarding the merits, on appeal before this Court the Levines argue that the district court erred when it declined to disentitle March from pursuing his petition under the fugitive disentitlement doctrine based on various state court orders of contempt. They also contend that the district court erred when it refused to allow discovery or a hearing on the merits prior to ruling on the petition, or otherwise permit them to develop their affirmative defenses. They further argue that the district court erred when it granted summary judgment in favor of March. Finally, in their combined brief replying to March's response to their appeal and responding to March's cross-appeal, the Levines assert that the *Younger* abstention doctrine is applicable to this case.

On cross-appeal, March argues that the district court erred when it failed to address his argument that the Levines have no standing to assert any defenses. He also argues that the district court erred when it considered certain audiotapes as admissible evidence for purposes of ruling on his petition.

---

also conducted separate *in camera* interviews of Samson and Tzipora with the assistance of a licensed clinical psychologist.

## II.

In addressing the questions raised in this appeal, we must keep in mind the following general principals inherent in the Hague Convention and the ICARA:

First, a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute. Second, the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.

*Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64 (6th Cir. 1996) (citations omitted).

### A.

As a preliminary matter, we need not address the Levines' abstention argument. Having invoked the jurisdiction of this Court, and in light of their goal to overturn the district court's order to return the children, the Levines' argument that "this court . . . abstain" is absurd. Final Combined Reply and Resp. Br. on Behalf of the Appellants at 43.

### B.

The Levines also argue as a threshold matter that the district court erred in declining to disentitle March from bringing his petition based on his fugitive status from various state court contempt orders.

Having carefully reviewed the parties' briefs in light of the applicable law, we hold that the district court did not abuse its discretion when it declined to disentitle March for the reasons set forth in its opinion. *See March*, ___ F. Supp. 2d at ___, No. 3:00-0736 at 42-51 (applying the factors set forth in *Degen v. United States*, 517 U.S. 820 (1996) (discussing application of the fugitive disentitlement doctrine), in light of *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion) (discussing the liberty interests of parents in the care, custody,

[W]e believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute--*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Id.* at 1069.

The Levines principally argued, pursuant to article 13(b) of the treaty, that the children should not be returned to March because to return them would present a grave risk of psychological and physical harm to Samson and Tzipora and place them in an intolerable situation. The Levines rely in large part on a default judgment they obtained in a wrongful death action against March after the disappearance of their daughter.

We find the circumstances surrounding the entry of this default, like the circumstances surrounding the Tennessee contempt orders, highly unusual, and suggestive of the home court advantage that the treaty was designed to correct. Specifically, this default judgment was entered as a discovery sanction. The Tennessee court denied a request by March to have his deposition conducted by telephone or videotape.[8] Then, when March did not present himself for the deposition locally, the Tennessee court ordered March's answer stricken and precluded him from presenting any testimony regarding defenses, declared that all the Levines' declarations in their petition were true and correct, and entered a default solely on

---

[8] At the time, March was living and working in Mexico trying to support his family while defending against the wrongful death claim. March avers that his finances and the necessity of caring for his children did not allow him to travel to Nashville, Tennessee, for the deposition.

the Levines' assertions that the exceptions to return of children under the treaty were applicable, the court found that they had not carried their burden, under the heightened clear and convincing evidence standard, of establishing that there were genuine issues of material fact regarding the treaty exceptions they raised. *March*, ___ F. Supp. 2d at ___, No. 3:00-0736 at 39, 41-42. We therefore incorporate and adopt the district court's thorough reasoning as the holding of this Court in regard to this issue as well. We pause only to comment briefly on the Levines' treaty exceptions and the highly unusual nature of this case.

When a motion for summary judgment is made and supported by competent admissible evidence, the nonmovant may not rest on his pleadings, but must come forward with affidavits or other admissible evidence setting forth "specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). To determine whether a factual dispute is genuine the court inquires "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A mere scintilla of evidence is insufficient. *Id.* at 252. Moreover, the evidence presented must be viewed through the prism of the substantive evidentiary burden, i.e., by the preponderance of the evidence or by clear and convincing evidence. *Id.* at 254. The evidence of the non-movant must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Id.* at 255.

Under the treaty and the ICARA, once the petitioner establishes wrongful removal or retention, as here, the respondent must establish by clear and convincing evidence the narrow exceptions under articles 13b and 20. Hague Convention, arts. 13b, 20; 42 U.S.C. § 11603(e)(2)(A); *Friedrich*, 78 F.3d at1067. In dicta, the *Friedrich* court stated:

and control of their children as being "perhaps the oldest of the fundamental liberty interests")). We therefore incorporate and adopt the district court's reasoning as the holding of this Court. However, we wish to comment briefly on the matter.

In arguing that March should have been disentitled from accessing the district court to seek return of his children, the Levines point to various state court contempt orders entered in both Illinois and Tennessee. The Illinois contempt orders arose during grandparent visitation proceedings, and stem primarily from March's failure to appear with the children.[6] The Tennessee orders, on the other hand, pertain to a probate proceeding. These contempt orders stem from March's alleged misconduct in a deposition and orders requiring him to repair some furniture and return various items of personal property, including a beaded evening bag and a baby blanket. The Tennessee contempt orders, among other penalties, ordered March to be imprisoned and fined, and ordered the court clerk to take appropriate action to enforce collection of the $50 per day fine (that then totaled $22,300) for March's failure to deliver the items.[7]

At the outset, we note that, however labeled, none of these contempt orders were "criminal" contempts because the fines

---

[6] Most of the Illinois contempt orders were entered *after* March moved to Mexico. An earlier contempt order was vacated on appeal. *See In re Visitation of March*, No. 96-D-15334, slip op. at 20-21, 26-27 (Ill. App. Ct. 1st Dis. June 30, 1998) (holding that March's due process rights were violated when the court conducted a hearing without notice to March; that the court improperly granted the grandparents equal, if not superior, visitation rights over those of the natural father; that an injunction preventing March from removing the children from Illinois was improperly entered without notice to him; and vacating the contempt for violation of the injunction).

[7] In his sworn declaration pursuant to 28 U.S.C. § 1746, March avers that he is unable to purge himself of the contempt despite his sincere desire to do so because he has looked for the items and has been unable to find them. He also avers that he personally testified to this and submitted sworn affidavits to this effect before the Tennessee court who imposed the contempt orders.

at issue were avoidable by performance of the required acts and no definite sentences were imposed. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631-32 (1988) (holding that the substance of the proceedings and the character of relief determines whether a contempt is of a civil or criminal nature). Furthermore, March is arguably not a fugitive given that the orders were entered against him *after* he moved to Mexico, especially when no order limited his travel at the time he moved. *Cf. Degen*, 517 U.S. at 823-24, 828 (declining to resolve the question whether Degen was a fugitive in all senses of the word where he had moved to Switzerland about one year prior to being indicted by a federal grand jury). Moreover, the Illinois court relinquished jurisdiction in the visitation proceeding before March filed his ICARA petition invoking the protections of the Hague Convention. The Illinois court thus indicated it has no interest in enforcing its orders.

To the extent that civil contempts have formed the basis for disentitlement, such cases are inapposite to the facts here because they involved appellate-level application of the doctrine to an appellant who was a fugitive from contempt orders entered by the district court in the case sub judice. *United States v. Barnette*, 129 F.3d 1179 (11th Cir. 1997); *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278 (2d Cir. 1997); *Stern v. United States*, 249 F.2d 720 (2d Cir. 1957) (per curiam). Here, all the contempt orders were entered by state courts and involved other kinds of proceedings than the Hague Convention petition at issue here. We decline to expand the fugitive disentitlement doctrine "to sanction by dismissal any conduct that exhibited disrespect for any aspect of the judicial system." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 246 (1993).

It is worth re-emphasizing the *Degen* Court's guidance to courts in deciding whether to disentitle a claimant: there must be "restraint in resorting to inherent power" and its use must "be a reasonable response to the problems and needs that provoke it." *Degen*, 517 U.S. at 823-24 (citations omitted). As the First Circuit recently recognized in an ICARA case,

[A]pplying the fugitive disentitlement doctrine would impose too severe a sanction in a case involving parental rights. Parenthood is one of the greatest joys and privileges of life, and, under the Constitution, parents have a fundamental interest in their relationships with their children. To bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh.

*Walsh v. Walsh*, 221 F.3d 204, 216 (1st Cir. 2000) (citations omitted). Given the fundamental rights at issue, we agree that disentitlement will generally be too harsh a sanction in a case involving an ICARA petition.

Here, even if the contempts were criminal in nature and March was clearly a fugitive from them, had the district court disentitled March from even arguing his ICARA petition because he did not return a beaded evening bag and a baby blanket it would have been an unreasonable response and an abuse of discretion. An ICARA petitioner should not be disentitled on such patently insignificant grounds. The district court therefore properly rejected the Levines' vindictive attempt to deprive March of his day in court. *Malitiis hominum est obviandum.*

## C.

The Levines also argue that the district court erred in granting summary judgment in favor of March. Again, having reviewed the parties' briefs in light of the applicable law, we also hold that the district court did not err in granting summary judgment in favor of March for the reasons set forth in its opinion. *March*, ___ F. Supp. 2d at ___, No. 3:00-0736 at 9-41. In brief, the district court found that March met his burden of establishing his custody rights in his children, that they were wrongfully retained by the Levines beyond the period of court-ordered visitation, and that the children habitually resided in Mexico at the time of their removal and wrongful retention and that the Levines failed to establish genuine issues of material fact on these issues. *March*, ___ F. Supp. 2d at ___, No. 3:00-0736 at 7, 9, 16, 18. In regard to