RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOSH HIMES; MARY HIMES,
                    *Plaintiffs-Appellants,*

          *v.*                                          No. 10-5114

UNITED STATES OF AMERICA,
                    *Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 08-00475—Karl S. Forester, District Judge.

Argued:  June 7, 2011

Decided and Filed:  July 13, 2011

Before:  COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** James T. Gilbert, COY, GILBERT & GILBERT, Richmond, Kentucky, for
Appellant. Dell W. Littrell, ASSISTANT UNITED STATES ATTORNEY, Lexington,
Kentucky, for Appellee. **ON BRIEF:** James T. Gilbert, COY, GILBERT & GILBERT,
Richmond, Kentucky, for Appellant.  Dell W. Littrell, Charles P. Wisdom Jr.,
ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

          McKEAGUE, Circuit Judge.  Plaintiff Josh Himes was injured while mowing
grass at an Army base when a deteriorating steam pipe fell from its place, striking him
in the head.  Himes and his wife sued the United States for these injuries.  The district
court granted summary judgment to the United States on the grounds that under the
Kentucky Workers' Compensation Law, the United States was an "up-the-ladder"

1

contractor, or statutory employer, and thus Himes' only remedy was the workers' compensation benefits he received from his direct employer. The Plaintiffs appeal this determination, arguing that no governmental entity can be a "contractor" for purposes of this up-the-ladder immunity, and that in this particular case, the mowing work Himes was performing was not a "regular and recurrent" part of business at the base as is required in order for the government to be considered a "contractor." They also appeal the district court's limitations on their discovery requests and its denial of their motion to hold a hearing on various motions. Because the district court correctly determined that the United States is entitled to up-the-ladder immunity and there is no merit to the other claims, we **AFFIRM**.

## I.

Plaintiffs Josh and Mary Himes are husband and wife. In 2007, Josh Himes was an employee of Ricky Childers Excavating & Fencing ("Childers"). Pursuant to a Grounds Maintenance Contract between Childers and the United States, Childers provided grounds maintenance services, including mowing, at the Blue Grass Army Depot ("BGAD"), an installation of the United States Army in Richmond, Kentucky. The BGAD is a 14,000-acre facility, used to store conventional and chemical weapons and dispose of obsolete weapons and weapons which must be destroyed by law.

The Childers contract included mowing and trimming in unrestricted, restricted, and chemical exclusion areas on the base, and provided for mowing of each designated area a certain number of times during each mowing season. Childers was responsible for providing all personnel, equipment, tools, supervision, and other services necessary to accomplish this work. The contract also required Childers to provide and maintain workers' compensation insurance for Childers employees who performed work at the BGAD. Childers obtained and furnished the United States with a Certificate of Liability Insurance showing that from January 1, 2007, through December 1, 2007, Childers was covered with workers' compensation insurance as required by Kentucky law.

The Army had been "contracting out" grounds maintenance, mowing, and trimming of the BGAD premises since around 1988. Prior to that time, it was accomplished by Army employees. The government asserts, however, that Army employees continued to perform a portion of the ground maintenance, like mowing. Prior to 2007, the Army had also apparently abandoned certain facilities on the premises. Certain asbestos-insulated steam pipes remained and their condition had deteriorated. These pipes were located near Loading Platform 53.

On August 1, 2007, Plaintiff Josh Himes was working as a Childers employee at the BGAD. Around 9:00 a.m., he was instructed to mow in a "restricted area" which included Platform 53. While he was mowing, a steam pipe fell from its pole and struck him on the head. There were no witnesses to the accident. The pipe crushed Himes' skull and caused multiple skull and facial fractures, causing severe traumatic brain injury, complete loss of vision in the left eye, loss of peripheral vision in his right eye, loss of hearing, loss of ability to smell, and severe spinal column injuries. He is now unable to work and unemployable.

As a result of the accident, Himes received full workers' compensation benefits pursuant to Childers' workers' compensation insurance policy.

Josh and Mary Himes filed the present Federal Tort Claims Act ("FTCA") complaint in district court on November 9, 2008.[1] In Count I, they alleged that Himes was a business invitee, and that the United States Army, a federal agency, failed to exercise ordinary care to maintain the premises in a reasonably safe condition. In Count II, Mary Himes asserted a claim for loss of spousal consortium.

On April 30, 2009, the United States filed a motion to dismiss and alternatively for summary judgment, arguing that the Kentucky Workers' Compensation Act provided the Plaintiffs' exclusive remedy. It asserted that under that Act, it was entitled to the "up-the-ladder" defense, which shields an employer up-the-ladder from the injured

---

[1]Josh and Mary first filed a claim for administrative settlement with the United States Army, as required,on March 13, 2008. The Army failed to respond within six months, and thus the claim was considered denied by operation of law. *See* 28 U.S.C. § 2675(a).

employee if the employer meets all the qualifications of a "contractor" within the meaning of the Act.[2] This, however, would require that the work Himes was doing at the time of the accident was a "regular and recurrent" part of the business at the BGAD.

The Plaintiffs responded that discovery would be necessary to determine whether, as the government alleged, the work Himes was doing was "regular and recurrent" work of the BGAD. The district court provided additional time to allow "limited discovery only on the issue of whether the work performed by Himes, as an employee of Childers pursuant to the Grounds Maintenance Contract, was a 'regular' and 'recurrent' part of the work of the Blue Grass Army Depot."

Pursuant to that order, the Himeses served a Request for Production of Documents on the government.[3] The government refused to provide the requested material, and instead filed a motion to quash and for a protective order, arguing that the discovery requests sought information that was irrelevant, privileged, and went beyond the authorized scope. The Plaintiffs opposed the motion. The district court agreed with the government that the discovery requests went "well beyond the bounds" of the court's order. The court granted the motion to quash and for a protective order, and entered the

---

[2] The United States also asserted that the Plaintiffs failed to prove that they had exhausted their administrative remedies. The district court denied the motion on that ground, and the issue is not relevant to this appeal.

[3] This included requests for several categories of information, namely: (1) All files or information utilized in preparing or supporting of the government's summary judgment Affidavits, as well as the bases for their factual assertions and conclusions; (2) All files or information "relating to or otherwise referencing the prevailing policies, procedures, standards, regulations, and instructions to any and all officers, employees, and agents of the Defendant . . . regarding obtaining contractors to provide 'grounds maintenance . . . on an Army installation such as or comparable to BGAD"; (3) All files or information relating to the decision to "contract out" the grounds maintenance work in 1988; (4) All files or information relating to the "mission" of the United States and Blue Grass Army Depot; (5) All files or information relating to the maintenance of restricted areas within the Blue Grass Army Depot; (6) All files or information relating to the contract between the United States and Childers, including prior versions, etc; (7) Information regarding who directed Himes to perform work in the restricted area; as well as whether the United States had knowledge of the steam pipe's deterioration and/or decided not to warn its contractors; and (8) All files or information relating to reports or documentation of the investigation of Himes' claim, including injury reports.

government's proposed order. This order limited discovery to the issue previously specified by the district court. It also, however, provided other restrictions.[4]

In discovery, the Plaintiffs were permitted to take the deposition of both Christine Wren, Supervisory Program Manager at the BGAD, and John Patton, Lead Engineer for Business Operations for Southeastern U.S. Public Works (who was designated as a Rule 30(b)(6) witness). Wren had worked at the BGAD continuously since 1980, and Patton was in charge of overseeing facility operations and maintenance—including ground maintenance—in Army installations in North Carolina, Kentucky, Louisiana, Tennessee, and Alabama.

Wren asserted that the work performed under the Childers contract was maintenance work done regularly and routinely, and was part of the overall maintenance and operation of the facility that was necessary for reasons such as security, safety, and fire protection. She also stated that before 1988, the type of maintenance work now done by Childers had been done by Army civilian employees and was now contracted out due to cost issues. She asserted that if the costs were to grow, the work would once again be done by Army employees.

Patton explained that many similar Army installations contract out such work, but that others use civilian personnel or even Army soldiers. Because Wren and Patton are employees in charge of overseeing such operations, who each have multiple years of personal knowledge on the subject, their testimony constituted evidence of several key facts: that mowing is considered maintenance work on the grounds of the BGAD;

---

[4]Specifically, the order stated that Requests 4, 5, and 7 were quashed "in their entirety," and that Request 8 was quashed to the extent it sought information beyond the findings of the OSHA investigation. It stated that all requests were quashed to the extent they sought confidential or privileged information, including attorney-client or work-product items. It further quashed the requests to the extent they sought information pertaining to any contract for mowing services, or for non-mowing services. The order further quashed all requests that sought records not maintained at the BGAD itself, sought personnel file records, or sought information "directly or indirectly pertaining to the security of BGAD."

that such mowing is done regularly at the BGAD; and that the BGAD and similar installations sometimes use their own employees to do this work.[5]

After discovery, the district court ruled on the motion for summary judgment. It concluded that "Himes' work—mowing and grounds maintenance—was indeed a 'regular' and 'recurrent' part of the business of the BGAD." It noted that many Army installations contract out these services, while some have the work performed by civilian personnel, and yet others still use Army soldiers to mow. The court reasoned that mowing is a "regular" activity, despite that the frequency may vary based on certain factors. Addressing the Plaintiffs' claims that mowing cannot be part of the "trade, business, occupation, or profession" of the BGAD, the court cited precedent from this Court holding that regular or recurrent work includes regular maintenance. Therefore, the district court found that the United States was entitled to up-the-ladder immunity under KRS § 342.690 and granted summary judgment. The Plaintiffs timely appealed.

**II.**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action is treated as a motion for summary judgment when matters outside the pleadings are presented to the court. *Mays v. Buckeye Rural Elec. Co-Op, Inc.*, 277 F.3d 873, 877 (6th Cir. 2002). Here, the district court decided the government's motion as one for summary judgment. This court reviews a district court's grant of summary judgment de novo. *Valentine-Johnson v. Roche*, 386 F.3d 800, 807 (6th Cir. 2004).

We review the district court's legal conclusions de novo and its factual findings for clear error. *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 620 (6th Cir. 2009). The district court's determination that the United States was an up-the-ladder employer entitled to immunity was a legal conclusion, and thus is reviewed de novo.

---

[5]Patton also produced at his deposition a section of his Department Technical Manual, which states that "[m]aintenance of grounds is essential to the mission of the [Department of Defense] installation." Patton explained that this included both the "specific military mission as well as the inherent support required to provide that military mission."

**III.**

The United States government has waived its sovereign immunity in limited contexts under the Federal Tort Claims Act ("FTCA"). The FTCA is the exclusive remedy for suits against the United States or its agencies sounding in tort. 28 U.S.C. § 2679(a). Under the FTCA, the United States can be liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Courts must look to the law of the state where the alleged wrong occurred to determine the liability of a private person. 28 U.S.C. § 1346(b). Here, Josh Himes was injured at the Blue Grass Army Depot in Richmond, Kentucky, so the court must apply Kentucky law.

It is undisputed that, by contract, the United States required Childers to obtain, and Childers did obtain, workers compensation insurance in the limits required by Kentucky law. It is also undisputed that Himes received workers' compensation benefits pursuant to that policy. Therefore, the issue is whether the United States is protected from further liability under the Kentucky Workers' Compensation Act. "Every employer" subject to the Act is liable in Kentucky for compensation for injury, disease, or death of an employee, "without regard to fault as a cause." KRS § 342.610(1). Therefore, employers are required to provide workers' compensation insurance to cover their employees; if they fail to secure such payment, an injured employee can claim workers' compensation benefits "and in addition may maintain an action at law." KRS § 342.690(2). The benefit to employers is that if they comply, the workers' compensation scheme becomes the exclusive remedy for any injured worker:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. For purposes of this section, the term "employer" shall include a "contractor" covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation.

KRS § 342.690(1).  The Act further provides:

> A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter . . . A person who contracts with another:
>
> > . . .
> > (b) To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person
>
> shall for the purposes of this section be deemed a contractor, and such other person a subcontractor.

KRS § 342.610(2).

Here, the United States asserts this "up-the-ladder" defense, in which an entity "up-the-ladder" from the injured employee who meets all the qualifications of a "contractor" is considered a "statutory employer," and is entitled to the immunity provided by KRS § 342.690.  The district court found that the United States was a "statutory employer" up the ladder from Josh Himes, entitled to the defense; it therefore granted summary judgment**.**

## IV.

The Plaintiffs argue that the district court erred when it concluded that the United States Army may take advantage of the statutory employer immunity, or "up-the-ladder defense," afforded to contractors under Kentucky Workers' Compensation law.  We disagree.[6]

---

[6]We note at the outset that although Plaintiffs assert a tort based on failure to maintain a safe premises for business invitees, the theory of recovery does not change the government's immunity. Kentucky law demonstrates that even in cases where the plaintiff alleges that the premises owner failed to keep the premises reasonably safe, such owners are immune from suit by employees or subcontractors if they otherwise meet the definitions under the Workers' Compensation provisions, because that system provides the exclusive remedy for such harms. *See, e.g., Crider v. Monarch Eng'g, Inc.*, 2008 WL 5102090, at *3 (Ky. App. Dec. 5, 2008) (finding that where a subcontractor was injured while painting a water tower, the premises owner was a "contractor" and thus was immune from suit despite the plaintiff's claims that the defendant failed to exercise reasonable care in making the premises safe for his use).

*A. "Persons" under the statute*

Plaintiffs argue that the Kentucky Supreme Court has determined that governmental entities are not "persons" under the Workers' Compensation Act, and thus cannot be contractors entitled to the up-the-ladder defense. The purpose of the up-the-ladder defense "is not to shield contractors from tort liability but to assure that both contractors and subcontractors provide workers' compensation coverage." *Davis v. Hensley*, 256 S.W.3d 16, 18 (Ky. 2008). It thus only protects contractors who, if they had failed to secure a paying subcontractor, would have been liable themselves as up-the-ladder employers.

In *Davis*, the Kentucky Supreme Court reasoned that while KRS § 342.630 requires both "persons" and "the state" to provide workers' compensation, governmental entities are not included in the definition of "person." Instead, the Workers' Compensation statute requires both "any person" and—separately—"the state" and its subdivisions, to comply with the Act. *Davis,* 256 S.W.3d at 19. Because the Act separately contemplates "persons" and "the state," and does not include the state within the definition of "person," *see* KRS § 342.0011(16), the provisions imposing up-the-ladder liability (on "persons") do not apply to the state of Kentucky. *Davis,* 256 S.W.3d at 19. Therefore, the court reasoned, if the state government had failed to secure a subcontractor that would cover the employee's damages, the statute would nonetheless *not* hold the state liable as an up-the-ladder employer.[7] *Id.* Therefore, if the state would not have been liable up-the-ladder, it was not entitled to an exclusive remedy defense on that basis. *Id.*

Plaintiffs argue that *Davis* conclusively determined that all governmental entities—including the federal government here—cannot claim the up-the-ladder defense. This argument is misplaced. First, though *Davis* used the phrase "governmental entities," it did so in the context of addressing a Kentucky state entity.

---

[7]Instead, the statute separately requires those who contract with the state to comply with the Act and fines those who fail to do so, KRS §§ 342.085, 45A.480, and ultimately places secondary liability in such circumstances on the Uninsured Employers' Fund. KRS § 342.760; *Davis*, 256 S.W.3d at 19 n.1.

When using the term "governmental entity," the court was attempting to encompass the broad range of entities within the state that are covered under the statute: "[t]he state, any agency thereof, and each county, city of any class, school district, sewer district, drainage district, tax district, public or quasipublic corporation, or any other political subdivision or political entity of the state that has one (1) or more employees subject to this chapter." KRS § 342.630(2). There is no indication *Davis* intended to include the federal government, or even contemplated that meaning.

Second, the court's rationale for refusing to grant the state the up-the-ladder defense was that, under the terms of the statute, the state would not have been liable as an up-the-ladder contractor/employer. Here, however, the federal government would have been so liable. The statute creates special rules for "the state," but is not written such that the federal government would fall within the state exception.[8] Because the Federal Tort Claims Act explicitly waives federal government immunity and allows tort claims against the United States "in the same manner and to the same extent as a private individual under like circumstances," the United States should be considered a private "person" under Kentucky's Workers' Compensation Act. *See, e.g., Bailey v. United States*, 2007 WL 1175048, at *3 (E.D. N.Y. 2007) ("Because the FTCA requires that the court treat the United States as if it were a 'person' under the relevant state law, and the Workers' Compensation Law specifically includes 'person' within its definition of employer, the United States must be treated as an employer under the law.").

"This Court is tasked with looking past the inherent differences between the Government and a private person in order to find the most reasonable private person analogy." *In re FEMA Trailer Formaldehyde Prods. Liability Lit.*, 2010 WL 3168116, at *7 (E.D. La. 2010) (granting statutory immunity from suit to FEMA based on Alabama statute that provided immunity for "any person . . . who voluntarily and without compensation" helps shelter persons during a disaster). Therefore, as a "person" in Kentucky, the United States *would* be made liable as an up-the-ladder employer—*unlike*

---

[8]Plaintiffs' counsel argued strenuously that the statute contemplates "persons" and "governmental entities," but the statute is not written so broadly. Instead, the second section contemplates "[t]he state" and "any other political subdivision or political entity of the state." KRS. § 342.630.

the state of Kentucky. If the United States would be liable up-the-ladder, it is entitled to an up-the-ladder defense if it complied with the Act and the subcontractor paid the worker's benefits.

To address one last matter, the Plaintiffs argue that "the United States is not liable to an employee of a contractor on its premises since 'Congress has never authorized the government to pay workers' compensation benefits to employees' of its contractors." (Appellant Br. at 13, quoting *McWhinnie v. United States*, No. 08-6071 (6th Cir. 2009)). Under KRS § 342.690(1), the exclusive remedy provision only applies if the employer "secures payment of compensation as required by this chapter." The Plaintiffs seem to argue that this means the contractor must establish that it has purchased, for itself, a workers' compensation program or insurance that would have paid a plaintiff's claim. They then argue that (1) since the government did not purchase workers' compensation insurance, it would not be liable to an employee like Josh Himes, and (2) since it would not be liable, it cannot receive the benefit of the exclusive remedy provision. However, Plaintiffs misread the statute.

First, an employer or contractor can "secure payment of compensation" without itself buying workers' compensation insurance—by doing precisely what the United States did here: it hired a subcontractor and required that subcontractor to purchase workers' compensation insurance that met the state requirements.

> If premises owners are 'contractors' as defined in KRS [§] 342.610(2)(b), they are deemed to be the statutory, or 'up-the-ladder,' employers of individuals who are injured while working on their premises and are liable for workers' compensation benefits *unless* the individuals' *immediate employers* of the workers have provided workers' compensation coverage.

*Gen. Elec. Co. v. Cain*, 236 S.W.3d 579, 585 (Ky. 2007) (emphasis added). "[A]n up-the-ladder contractor is immune from tort liability to an injured employee of a subcontractor if it proves that the immediate employer of the injured employee had secured coverage for the employee." *Pennington v. Jenkins-Essex Const., Inc.*, 238 S.W.3d 660, 666 (Ky. App. 2006). As this court has determined in similar

circumstances, through hiring the contractor who carried workers' compensation insurance, "the United States took advantage of the 'up-the-ladder' immunity provision of § 342.690(1) and would be entitled to immunity should it qualify under the rest of the definition of 'contractor' as found in § 342.610(2)." *McWhinnie*, No. 08-6071, Slip. Op. at 4.

Second, the fact that Congress has not authorized the government to pay workers' compensation benefits does not mean, as Plaintiffs assert, that the United States "would not have been liable to Josh had his employer not secured those benefits for him." (Appellant Br. at 14.) Instead, the United States would then be liable (through the FTCA) to the same extent as an ordinary person, and an ordinary person is "liable for the payment of compensation to the employees of the subcontractor *unless* the subcontractor . . . has secured the payment of compensation." KRS § 342.610(2) (emphasis added).

If Himes' employer had not secured benefits, the United States would be liable to Josh for the full amount of his damages—workers compensation and damages at law. *See* KRS § 342.690 (2) (providing that an employer who fails to secure payment is liable for both compensation under the workers' compensation chapter and, "in addition," for "an action at law"). "[I]t is the potential liability for workers' compensation benefits that relieves the contractor of tort liability." *Pennington*, 238 S.W.3d at 666. Because it would have been liable up-the-ladder if Himes' employer had failed to provide coverage, the United States is likewise entitled to the up-the-ladder defense now that his employer has done so (as long as it qualifies as a contractor).

Put simply, the FTCA subjects the United States to liability "to the same extent" as an ordinary person; it does not expose the United States to *broader* liability. If Childers' contract had instead been with a private party, and Himes was then injured in similar circumstances, that private party would have been protected from further liability as an up-the-ladder employer. The same is true of the United States in this case.

*B.   "Regular or recurrent" work*

An entity up-the-ladder from an injured employee is only entitled to the defense if it meets all the qualifications of a "contractor" under KRS § 342.610(2).  *See* KRS § 342.690.  A person is a contractor if they "contract with another" to have work performed "of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession" of that person.  KRS § 342.610(2)(b).  If deemed a contractor, a person is "deemed to be the statutory, or 'up-the-ladder,' employer[] of individuals who are injured while working on their premises and are liable for workers' compensation benefits unless the individuals' immediate employers of the workers have provided workers' compensation coverage." *Cain*, 236 S.W.3d at 585.  Such contractors are "immune from tort liability" to the employees of the subcontractor if the subcontractor has secured the payment of compensation.  KRS § 341.610(2). Because we interpret the federal government to be a "person" within this statute, the only remaining issue is whether the work done by Josh Himes was a "regular or recurrent" part of the business at the BGAD.

The Plaintiffs argue that the government failed to meet its burden to demonstrate that the mowing Himes was performing when injured was a "regular or recurrent" part of the work at the BGAD.  They assert that while Christine Wren testified in her affidavit that mowing and trimming is maintenance work done regularly and routinely at the BGAD, she points to no specific directive or regulation specifying that this is so. Therefore, the Plaintiffs assert, this is a bare assertion that does not rise to the level of "substantial evidence" needed to support summary judgment.  They also argue that mowing is not part of the "business" of the Army, and instead assert that the Army's business is preparing for war, which has nothing to do with mowing.

However, it is clear that the work Himes performed was maintenance work at the BGAD.  The Kentucky Supreme Court recently defined "regular or recurrent" work as that which is "customary, usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would

normally perform or be expected to perform with employees." *Cain*, 236 S.W.3d at 588. Furthermore, "employees of contractors hired to perform routine repairs or maintenance are generally viewed as being statutory employees under the Act. Such maintenance work on an employer's physical plant is classified as a matter of law to be a regular and recurrent part of the employer's business." *Bratcher v. Conopco, Inc.*, 2008 WL 2065202, at \*2 (Ky. App. May 16, 2008) (citing *Cain*, 236 S.W.3d at 588).

Our Court has interpreted the provision similarly. In *Thompson v. The Budd Co.*, 199 F.3d 799 (6th Cir. 1999), this Court addressed Kentucky's Workers' Compensation Act and considered the same "regular or recurrent business" provision. The employer, Budd, ran an automobile part stamping plant, and Budd had hired a subcontractor, Merrick, to maintain its heating, ventilation, and air conditioning system. The plaintiff, Thompson, was a Merrick employee, and was injured while changing the air system filters. The Court summarized past Kentucky and Sixth Circuit law before concluding that "'part of . . . the business of such person' incorporates more than the primary task of Budd's company. Its business of 'stamping automotive parts,' therefore, may include more than the actual assembly line production of auto parts. . . . [S]ection 342.610 encompasses regular maintenance of manufacturer's physical plant . . ." *Id.* at 805.

These cases demonstrate that the work Himes was doing as a Childers employee was "regular and recurrent" work at the BGAD. Just as maintenance of an air conditioning system might not be, in the strictest sense, the true business of a manufacturing plant, the mowing that Himes performed at the BGAD may not have been the BGAD's direct business; however, both were routine maintenance tasks necessary for the running of the facilities. Following Kentucky precedent requires that such routine maintenance be regarded as "regular and recurrent" work of any business, as it must be done in order for the facility to continue its true mission.[9] The United States put forth affidavit evidence, from both Christine Wren and John Patton, that mowing was

---

[9]Similarly, in *Budd*, "the plant contained a mezzanine level electrical substation" that was a "restricted area," which "remained locked to ensure limited access." *Budd*, 199 F.3d at 803. Thompson was admitted to this restricted area to do his task, and it was within this area that he was injured. *Id.* Therefore, even if the area Himes was working was considered "restricted," that does not change the "regular and recurrent" analysis.

done as regular maintenance work at the BGAD. They explained that this work was necessary for the running of the base, including for safety, security, and administrative reasons, and that the work had been, sometimes still is, and might in the future be, done by Army personnel. As employees in charge of overseeing such operations, who each have multiple years of personal knowledge on the subject, this constitutes substantial evidence of several key facts: that mowing is considered maintenance work on the grounds of the BGAD; that such mowing is done regularly at the BGAD; and that the BGAD and similar installations sometimes use their own employees to do this work.

The Plaintiffs have failed to come forward with any specific facts to dispute the facts that mowing by Childers at the BGAD is regularly performed, that it is considered ordinary maintenance work, or that such work used to be, occasionally is, and might in the future be, done by BGAD employees. In light of Kentucky case law stating that maintenance work is considered "as a matter of law to be a regular and recurrent part of the employer's business," *Bratcher,* 2008 WL 2065202 at *2, Himes' argument that mowing is not part of the BGAD's business must fail. Therefore, the district court correctly concluded that Himes' work pursuant to the contract between Childers and BGAD constituted "regular and recurrent" work, and the United States was entitled to immunity as a "contractor" under KRS § 342.690(1).

## V.

The Plaintiffs also argue that the district court erred by quashing their discovery requests, and entering a protective order for the defendants. They argue that the quashed requests involved information that was necessary to determine the "trade, business, occupation, or profession" of the BGAD in order to assess whether Himes' mowing was "regular or recurrent" work. They also argue they were entitled to seek information relating to the Army's knowledge of the deteriorated steam pipe, because if agents of the government were aware of its dangerous nature and sent contract employees into the area, such conduct is not "regular or recurrent."

This court reviews a district court's decisions regarding discovery matters for an abuse of discretion. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (citations

omitted).  Reversal is proper "only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *Id.* (internal quotation marks and citation omitted).

Here, no abuse of discretion occurred.  The district court had explicitly allowed discovery "only on the issue of whether the work performed by Himes, as an employee of Childers pursuant to the Grounds Maintenance Contract, was a 'regular' and 'recurrent' part of the work of the Blue Grass Army Depot."  The Plaintiffs' discovery requests clearly exceeded this limited scope.  Only three requests were quashed "in their entirety": (4) All files or information relating to the "mission" of the United States and Blue Grass Army Depot; (5) All files or information relating to the maintenance of restricted areas within the Blue Grass Army Depot; and (7) Information regarding who directed Himes to perform work in the restricted area; as well as whether the United States had knowledge of the steam pipe's deterioration and/or decided not to warn its contractors.

Most clearly, Request Seven goes directly to the merits of the Plaintiffs' claims, but does not address whether Himes' work—mowing the grass—was regular or recurrent at the base.  The Plaintiffs' argument that sending contract employees into dangerous areas cannot be "regular or recurrent" work is a thinly-veiled attempt to conflate the questions of what is regular work at the BGAD, and whether the United States was at fault.  Even if the United States knew of the pipe's condition and negligently chose not to warn Himes, that would not change the issue of discovery: whether the mowing itself was "regular or recurrent." As to Requests Four and Five, Kentucky has clearly stated that regular maintenance work, such as mowing of the premises, is considered "regular and recurrent" work of a business.  Because of this, no information regarding some more specific "mission" of the BGAD or about the maintenance of restricted areas would change the ultimate determination about the type of work Himes was doing.  And also because mowing is regular or recurrent "as a matter of law," *Bratcher*, 2008 WL 2065202, at *2, the Plaintiffs cannot demonstrate that quashing those requests "affect[ed]

substantial rights" or "amount[ed] to more than harmless error." *Dortch,* 588 F.3d at 400.

The court's order also quashed the requests to the extent they sought "confidential" information pertaining to any contract for mowing services, or any information about contracts for non-mowing services. However, since the only issue for discovery was whether mowing was "regular or recurrent," the second set of documents (contracts which "do[] not pertain to the provision of mowing services") were properly found to be outside the scope. Any error in exclusion of the first portion, relating to all mowing contracts, was harmless error. The Plaintiffs had possession of the contract under which Himes himself worked, and therefore the "regular or recurrent" nature of that work could be assessed.

The rest of the requests were not quashed in their entirety, but were limited only to the extent that they sought privileged information, records outside the BGAD, private personnel files, or BGAD security information. All of these limitations were legitimate and within the court's discretion.

Ultimately, the Plaintiffs were allowed to take discovery on the issue approved by the district court. They were allowed to depose United States officials—knowledgeable about ground maintenance specifically—at the local and regional level. The Plaintiffs were able to inquire about the nature of the work done and who generally does such work at the BGAD and similar installations. The Plaintiffs cannot show "how [further] discovery would rebut the movant's showing of the absence of a genuine issue of material fact." *Singleton v. United States*, 277 F.3d 864, 871 (6th Cir. 2002). Therefore, the court did not abuse its discretion in restricting the Plaintiff's discovery requests.

## VI.

Lastly, the Plaintiffs argue that the district court abused its discretion by refusing to afford them a hearing on the discovery motions and on the motion to dismiss. They essentially assert that they were entitled to such a hearing under Federal Rule of Civil

Procedure 56**10** and the Local Rules for the Kentucky District Courts.  This argument is without merit.  While the Plaintiffs were certainly entitled to request a hearing, the district court was within its discretion to deny such motions: our Court as well as other circuits have held that "Rule 56 does not require an oral hearing on a motion for summary judgment." *Banfield v. Turner*, 66 F.3d 325, 1995 WL 544085, at *4 (6th Cir. 1995).  Instead, the mention of a "hearing" simply requires an adequate chance to present evidence and arguments, and respond to those of one's opponent. *See March v. Levine*, 249 F.3d 462, 473 (6th Cir. 2001); *Chrysler Credit Corp. v. Cathey,* 977 F.2d 447, 449 (8th Cir. 1992) (holding that the parties' rights to be heard on a summary judgment motion are satisfied by the opportunity to submit briefs and supporting affidavits); *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev*., 922 F.2d 168, 176 (3d Cir. 1990) ("When Rule 56 speaks of a 'hearing,' we do not read it to require that an oral hearing be held before judgment is entered.  An opportunity to submit written evidence and argument satisfies the requirements of the rule."); *Landham-Hill Petroleum Inc. v. Southern Fuels Co.*, 813 F.2d 1327 (4th Cir. 1987) ("There is no absolute requirement that a ruling on a motion for summary judgment be preceded by a hearing.").  Furthermore, the Local Rule cited by Plaintiffs simply states that a party can "request" a hearing—not that they are entitled to one.**11**  This Court has previously rejected a claim that the district court abused its discretion by not conducting an oral hearing under these rules. *Chicago Ins. Co. v. Chimnee Cricket*, 17 F. App'x 374, 383 (6th Cir. 2001).

Here, the Plaintiffs fail to demonstrate what arguments or responses they could not make in their briefs and memoranda on these issues.  On the contrary, they were able to fully make their arguments and present their evidence on both issues.  Since they had

---

**10**At the time of these proceedings, Rule 56 provided, in relevant part that: (1) Any party may move for summary judgment on all or part of a claim, Fed. R. Civ. P. 56(a); (2) The motion "must be served at least 10 days before the day set for the hearing," and "[a]n opposing party may serve opposing affidavits before the hearing day," *id.* at 56(c); and (3) summary judgment should be rendered if there is no genuine issue of material fact.  However, the Rule was amended on March 26, 2009, effective December 1, 2009 (and again on April 28, 2010, effective December 2, 2010). The rule no longer contains the language discussed here regarding the "time fixed for the hearing" or "the hearing day." It instead provides time limits running from the close of discovery.

**11**In fact, the next subsection states that "[a] motion is submitted to the Court for decision after completion of the hearing or oral argument—or if none—after the reply memorandum is filed . . ." JT. KY. LOC. R 7.1(g).

an opportunity to conduct discovery, prepare and submit affidavits, and present memoranda and briefs for the court to consider, the Plaintiffs were "heard" within the meaning of Rule 56. *See* 27A FED. PROC., L. ED. § 62.673. Therefore, the district court did not abuse its discretion.

## VII.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.