**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0235n.06

No. 11-5913

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Mar 28, 2014

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ESTATE OF STEPHEN W. DOHONEY, by and through the administratrix, Tamara Dohoney; R.W.D. and K.E.D., Minors, by and through their natural mother, Tamara Dohoney; TAMARA DOHONEY, individually, | ) ) ) ) ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| INTERNATIONAL PAPER COMPANY, | ) ) | |
| Defendant-Appellee. | | |

**BEFORE: BOGGS, NORRIS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Tamara Dohoney,[1] the widow of a Kentucky worker who suffered a fatal injury, appeals the district court's grant of summary judgment to Appellee, International Paper Company (IP), challenging the district court's determination that IP is shielded from tort liability by "up-the-ladder" immunity under Kentucky law,[2] and thus workers' compensation provides the exclusive remedy. We REVERSE and REMAND for further proceedings.

---

[1] Tamara Dohoney acts as plaintiff individually, as adminstratrix of her deceased husband's estate, and as mother of her two children, R.W.D. and K.E.D.

[2] Because this is a diversity case, Kentucky substantive law controls. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 73 (1938).

1

# I.     BACKGROUND FACTS AND LAW

## A.  The Accident

Konecranes (also known as Crane Pro) is a crane manufacturing and service company that had a crane-servicing contract with IP.  On August 28, 2009, 34-year-old Stephen Dohoney, a Konecranes employee, was fatally electrocuted while performing electrical work on IP's "house crane" during a regularly scheduled plant shutdown at IP's mill in Henderson, Kentucky.  According to the August 28, 2009 "List of work to be performed by Crane Pro[/Konecranes] on shutdown," Dohoney and a fellow Konecranes employee were to perform four tasks during the 16-hour plant shutdown:

1.  Replace wiring on limit switches on Crane hooks;
2.  Annual Preventative Maintenance on the house crane
    Pull and inspect the motor coupling on #1 and #3 crane hooks
    Remove rope guides and lube
    [V]isual inspection of the rope drums
    [V]isual inspection of the crane rails and wheels
    [C]ondition of the brake assy (sic) and check and measure air gap
3.  [R]eplace disconnect on the smaller crane in the Maint[.] shop;
4.  [R]epair of the pendant on the smaller hydrapulper crane

In order to rewire the limit switch, Dohoney positioned himself on the "bridge," a narrow walkway atop the house crane.  While replacing the wiring, he cut a 100-limit switch cord that, unbeknownst to him, was still "live."  Apparently the disconnects were broken.  Dohoney was electrocuted and found hanging in the air, attached to his fall-arrest harness.

Dohoney's widow, Tamara Dohoney ("Mrs. Dohoney"), received workers' compensation benefits through Konecranes and filed this wrongful-death action against IP alleging various negligence claims under Kentucky law.  IP sought and was granted summary judgment on the basis that it is entitled to "up–the–ladder" immunity under the Kentucky Workers' Compensation

2

Act (KWCA), Ky. Rev. Stat. § 342.690, because IP was Dohoney's statutory employer and Konecranes carried workers' compensation insurance.

## B. The Statute

The Exclusive Remedy provision of the KWCA, Ky. Rev. Stat. § 342.690(1), provides:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee. . . . For purposes of this section, the term "employer" shall include a "contractor" covered by subsection (2) of KRS § 342.610, whether or not the subcontractor has in fact, secured the payment of compensation.

Ky. Rev. Stat. § 342.610(2) provides in pertinent part:

> A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter . . . . A person who contracts with another:
> . . . .
> (b) To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person . . . shall for the purposes of this section be deemed a contractor, and such other person a subcontractor.

## C. *General Electric Co. v. Cain*

The Kentucky Supreme Court discussed the proper application of these statutory provisions in *General Electric Co. v. Cain*, 236 S.W.3d 579 (Ky. 2007), where it considered whether employees who were injured while performing work for their direct employers on premises owned by various businesses named as defendants were precluded from pursuing tort actions against those defendants.

> Work of a kind that is a "regular or recurrent part of the work of the trade, business, occupation, or profession" of an owner does not mean work that is beneficial or incidental to the owner's business or that is necessary to enable the owner to continue in business, improve or expand its business, or remain or become more competitive in the market. It is work that is customary, usual, or normal to the particular business (including work assumed by contract or required

by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees.

The test is relative, not absolute. Factors relevant to the "work of the . . . business," include its nature, size, and scope as well as whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform. Employees of contractors hired to perform major or specialized demolition, construction, or renovation projects generally are not a premises owner's statutory employees unless the owner or the owners of similar businesses would normally expect or be expected to handle such projects with employees. Employees of contractors hired to perform routine repairs or maintenance that the owner or owners of similar businesses would normally be expected to handle with employees generally are viewed as being statutory employees. Whether a project is customized to the premises owner's needs is irrelevant.

When characterizing a project as being routine repair or maintenance versus a capital improvement, a relevant consideration is whether the premises owner capitalized and depreciated its cost for tax purposes or deducted its cost as a business expense. Capitalized costs tend to indicate that the business was not the injured worker's statutory employer, while expensed costs tend to indicate that the owner was the statutory employer. This factor is not conclusive, however, because even projects performed entirely with a premises owner's workforce may be capitalized depending on their character. It is irrelevant when a contractor's employees are used to supplement the premises owner's workforce. Stated simply, KRS 342.610(2)(b) refers to work that is customary, usual, normal, or performed repeatedly and that the business or a similar business would perform or be expected to perform with employees.

*Cain*, 236 S.W.3d at 588–89.

Looking to dictionary definitions, *Cain* defined "recurrent" as "occurring or appearing again or repeatedly," which would apply to, *e.g.*, routine maintenance; and defined "regular" work as a "customary, usual or normal part of the premise owner's 'trade, business, occupation, or profession,' including work assumed by contract or required by law." *Cain*, 236 S.W.3d at 586 (citing Webster's New College Dictionary 934 (1995)). Neither term requires regularity or recurrence with the precision of a clock or calendar. *Cain*, 236 S.W.3d at 586 (citing *Daniels v. Louisville Gas & Elec. Co.*, 933 S.W.2d 821, 824 (Ky. Ct. App. 1996)).

4

In *Cain*, the plaintiffs or their decedents worked in multiple locations where they were possibly exposed to asbestos, and the court applied its test to each work location. In remanding plaintiff Rehm's claim against Reynolds Metals Company, the *Cain* court found that although Reynolds's manufacturing process was highly mechanized and consisted of numerous conveyors, machines, and other equipment, and their installation, removal, and maintenance were regular and necessary parts of Reynolds's operations, there was no evidence that Reynolds employees performed or were expected to perform the type of work Rehm was engaged in:

> although there was substantial evidence that it was normal for Reynolds employees to repair and maintain the plant's machinery and equipment, there was no substantial evidence that they would perform a six-week project to remove, replace, and install machinery, piping and other equipment or repair cranes.

*Cain*, 236 S.W.3d at 604.

The *Cain* court also reviewed Rehm's work at Goodrich, found that although Goodrich employees worked on some capital projects and some major repairs, the evidence failed to show that a project such as Rehm described [removing and replacing machinery, pumps, motors and pipes] was "work of a kind that the company would normally expect or be expected to perform with employees rather than outside contractors" and thus remanded. *Id* at 600. And, in evaluating Rehm's work at American Standard, the court found that although there was evidence that Rehm "performed work that was regular or recurrent at American Standard," there was not substantial evidence that "all of the work he performed was of a kind that American Standard or similar businesses would normally perform or be expected to perform with employees." There was testimony that Rehm and his co-employees performed "certain 'specialized projects' and work that American Standard's maintenance staff was unable to handle" and "lacked the capacity to perform," and "nothing indicated that [American Standard employees] or employees

of a similar business would normally" perform the work Rehm was performing while exposed to asbestos. Accordingly, the court remanded the case against American Standard. *Id*. at 593–94.

Finally, in reviewing Rehm's work at General Electric's Appliance Park site, the court explained that although a contractor performs a high volume of work, it does not necessarily follow that every kind of work that the contractor performs is regular or recurrent:

> Although evidence that a contractor performs a high volume of work for a business for a number of years shows that the contractor works regularly or recurrently for that business, it does not show that every kind of work that the contractor performed was regular or recurrent. Nor does it show that the business or similar businesses would normally be expected to use employees for every kind of work that the contractor performed.

*Cain*, 236 S.W.3d at 599.

### D.  The District Court Ruling

The district court noted that Kentucky courts and the Sixth Circuit have consistently held that "routine repairs and maintenance projects are a 'regular or recurrent' part of business operations" and observed:

> In the present case, Konecranes installed three cranes at the Mill in 1995 to facilitate the manufacture of paper products. The sixty-ton bridge crane is used daily to transport thirty-ton rolls of paper sixty feet down from the second level to the ground floor of the Mill and across the facility to complete the manufacturing process. No other crane at the Mill has the capacity to move the thirty-ton rolls of paper. James Hunt, International Paper Reliability Engineer, testified that the regular repair and maintenance of the 60-ton crane is an essential part of the Mill's business. From 1995 through August 2009, each of the Mill owners had a service contract with Konecranes to complete monthly crane inspections and crane repairs. Specifically, International Paper had a contract with Konecranes to provide crane and hoist services for the 2009 calendar year.
>
> From July 2002 through the date of the accident, Konecranes employees serviced the Mill cranes over 150 times. At the time of the accident, Dohoney was replacing the limit switch wiring on the 60-ton crane pursuant to the service contract. Clearly, the periodic maintenance and repair of the cranes are integral to the work performed at the Mill.

6

*Estate of Dohoney ex rel. Dohoney v. International Paper Co.*, No: 4:10CV-00030-JHM, 2011 WL 2935115, at *4 (W.D. KY. July 18, 2011). From there, the district court concluded that there was no genuine issue of material fact "that the periodic maintenance and repair of the cranes by Konecranes employees are a regular or recurrent part of International Paper's business." *Id* at *5.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The parties dispute whether the replacement of limit-switch wiring, work Dohoney was engaged in at the time of his death, was "regular or recurrent" work of IP, and whether IP or a business like IP would expect or be expected to perform the limit-switch wiring with an employee. Mrs. Dohoney argues that although Konecranes's general role at IP was crane maintenance and repair and that such repair activity was regular or recurrent in general, the limit-switch wiring replacement her husband was performing at the time of his death was neither regular nor recurrent or work normally expected of an employee. She asserts, correctly, that our inquiry must focus on the actual work being performed at the time of the injury.

The instant case presents disputed questions of fact similar to those presented in *Cain*. IP asserts that its employees performed limit-switch wiring replacement and that limit-switch

wiring replacement is customary, usual, or performed repeatedly. There was evidence, however, that IP engaged in only preventative maintenance or simple work involving installing safety latches, replacing tangled switch wires, changing card drives and cords, stringing rope, tightening terminals, blowing the cabinets out, checking the air conditioners to make sure they were running, checking parameters in the drives, replacing a pin, temporarily repairing "rails" until Konecranes could replace them, and replacing a remote-control box by installing new batteries, and that such activities are different in kind from the work at issue.

IP asserts that in 1996, IP employee Matt Gish and a Konecranes employee "replaced every relay and every electrical component" in the house crane. However, Gish did not testify specifically that he replaced the limit-switch wiring:

> [W]ith a Crane Pro tech, him working on one end, I working on the other, we replaced every relay and every electrical component in that crane because after a start-up, it was built in that we replace all those components because it was used so much during our start-up, to make sure it was new again.

Gish testified on deposition that he worked on the crane, but he qualified that by saying that the work was limited, and "[i]f they [Konecranes] needed assistance, if they didn't have enough man power, then we would provide that." He also testified that he is not aware of any IP employee ever replacing a limit switch. Further, even if Gish helped replace the limit-switch wiring initially, the one-time assistance of a Konecranes technician in replacing components over-extended by the mill's initial start-up thirteen years before Dohoney's death is but one fact to be considered together with all the evidence in determining whether the work was usual, customary, or recurrent, and whether it was of a kind normally performed by IP's or similar businesses' own employees.[3] The same is true of IP's additional arguments. [4]

---

[3] The cases on which the district court relied hold that routine repairs and maintenance are "regular or recurrent" parts of business operations but are similarly distinguishable. In *Granus v. N. Am. Philips Lighting Corp.*, 821 F.2d

Also relevant is that IP's Maintenance Team Leader, Michael Jones, testified that Konecranes had been the exclusive repairer and maintainer of the house crane since at least 1996 and that "as far as maintenance and work performed during shutdowns, [he] would rely on Konecranes to perform the work because Konecranes has specialized knowledge to do so . . . . And employees of International Paper do not have that specialized knowledge." And, although Hunt's affidavit asserted that "from July 2002 through the date of the accident, Konecranes employees serviced the Mill cranes over one hundred fifty times," his affidavit does not detail what work was specifically performed, i.e., inspection versus repair, or on which crane the work was performed, and the affidavit does not state that the limit-switch wiring on the house crane was ever replaced. Hunt also testified on deposition that "other than emergency situation [sic] or really, really simple stuff, Konecranes would be the exclusive maintainer and repairer of the house crane."

David Haynes, IP's Mill Manager at the time of Dohoney's death, testified on deposition that the first item on the August 28 list (replace limit-switch wiring) was not work IP normally has done itself. He also testified that he was not aware that the limit-switch wiring had ever been replaced before and that replacement of limit-switch wiring is not something normally done by

1253 (6th Cir. 1987), there was no dispute that the repairs made were routine; here, Dohoney disputes this factor with supporting evidence. *Burroughs v. Westlock Vinyls, Inc.*, No. 5:07-CV-89-R, 2008 WL 5192237 (W.D. Ky. Dec. 11, 2008), involved supplementing an existing pool of pipefitters with contracted pipefitters. This work fell squarely within the definition of "regular or recurrent" and was work performed by existing staff. *Thompson v. Budd Co.*, 199 F.3d 799 (6th Cir. 1999), involved regular maintenance that was undisputed because changing air filters was a regular element of Budd's plant maintenance. *Murphy v. Louisville Gas & Electric Co.*, No. 5:07-CV-89-R, 2007 WL 3231550 (W.D. Ky. Oct. 30, 2007), involved supplementing an existing maintenance team by providing additional staffing to do the regularly performed preventative maintenance at the substations, transformers and circuit breakers. *Franke v. Ford Motor Co.*, 398 F. Supp. 2d 833 (W.D. Ky. Oct. 31, 2005), involved doing work that was completed over fifty times by the plaintiff. *Daniels v. Louisville Gas & Electric Co.*, 933 S.W.2d 821 (Ky. Ct. App. 1996), involved using a contractor to perform routine emission testing to comply with government-mandated regulation. *Hosack v. Grayson Rural Electric Co-op*, No. 2003-CA-001290-MR, 2004 WL 2482609 (Ky. Ct. App. Nov. 5, 2004), involved weekly maintenance, and *Himes v. United States*, 645 F.3d 771, 781 (6th Cir. 2011), involved work previously completed by employees and now outsourced to the contractor.

[4] The district court correctly concluded that IP's treatment of Konecranes's activities as a business expense rather than a capital expense is relevant; however, *Cain* made clear that this factor is not conclusive. *Cain*, 236 S.W.3d at 588.

IP employees. Haynes further testified "if the crane was deemed inoperable, [he] would send anybody trained up to diagnose the crane and that if the resolution can meet the level of training that they have with respect to the crane, [he] would expect [either James Brantley or Gish, IP maintenance employees] to make the repairs." However, Brantley testified that Konecranes does the repairs and preventative maintenance on the crane during shutdowns.

Lastly, the "List of work to be performed by Crane Pro on shutdown," breaks out the work Crane Pro was to perform during the August 2009 shutdown. Items #1 and #3 were assigned unique purchase order (PO) numbers, 4104220472 and 4104220468, respectively, while item #2, "Annual PM," was assigned PO number C501313261, the same PO that provides "Crane & Hoist services." The fact that item #1, "the replacement of wiring," was not included in item #2, the "Annual PM," nor included under the general purchase order for "Crane & Hoist Services," and was assigned its own individual work order, supports the position that the work Dohoney did was non-customary work, because it was outside the scope of the general purchase order, the work Konecranes regularly performed.

Because Mrs. Dohoney presented sufficient evidence to raise a genuine dispute whether the work Dohoney was engaged in was "work that is customary, usual, or normal to the particular business or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees," we **REVERSE** the grant of summary judgment to IP and **REMAND** for further proceedings.