NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0615n.06

No. 13-6582

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Aug 08, 2014*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVE DUNN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| CORNING, INCORPORATED, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: MOORE, SUTTON, and ALARCÓN[*], Circuit Judges.

ALARCÓN, Circuit Judge. Steve Dunn was injured while working on an expansion project at Corning, Incorporated's ("Corning") Harrodsburg, Kentucky plant. Dunn filed a civil action against Corning alleging negligence. He alleged that Corning had negligently maintained the premises where he was injured and had failed to comply with health and safety laws. The district court entered summary judgment for Corning. It concluded that Corning qualified as a "contractor" under Kentucky's Workers' Compensation Act and was therefore immune from tort liability. Dunn appeals from the district court's determination that Corning was a contractor. We affirm because we are persuaded that Corning is a contractor with respect to Dunn and is his direct employer under Kentucky's Workers' Compensation Act.

_____

[*] The Honorable Arthur L. Alarcón, Senior Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

No. 13-6582
*Dunn v. Corning, Inc.*

I

As of 2013, Corning's Harrodsburg, Kentucky plant was its only United States–based plant for its Corning Glass Technologies Division. Corning Glass Technologies Division largely focuses on the production of flat glass for liquid crystal displays (LCD) and similar applications.

In early 2012, Corning contracted with Comstock Brothers Electric Company, LLC ("Comstock") to provide electricians for maintenance support at the Harrodsburg plant for the 2012 calendar year. In April 2012, Steve Dunn, a Comstock electrician, was assigned to run conduit for the electricity in the plant's existing cullet crusher pit for a batch-expansion project at the plant. The purpose of this expansion project was to add a third mixer, dubbed Weigh/Mix 3, to expand Corning's capacity for glass production. The expansion was a new construction project that did not come under the control or guidance of Corning's regular maintenance department.

On April 2, 2012, Dunn was seriously injured while attempting to exit the cullet crusher pit. The only exit from the crusher pit was a hatch at the top of a ladder. When Dunn opened the closed hatch to exit, its door swung open, struck the corner of the cullet crusher, rebounded, and struck Dunn in the head, knocking him off the ladder and causing him to fall several feet into the pit below.

On December 6, 2012, Dunn sued Corning in Kentucky's Mercer County Circuit Court. Dunn's complaint asserted that Corning's failure to comply with the Kentucky Occupational Safety and Health Act and the Federal Occupational Safety and Health Act constituted negligence per se. Dunn also alleged that Corning was negligent in failing to discover latent dangers in entering and

exiting the cullet crusher pit. Corning removed this matter to the federal district court on the basis of diversity jurisdiction under 28 U.S.C. § 1332.

Following discovery, Corning moved for summary judgment on the ground that it was immune from tort liability to Dunn under Kentucky's Workers' Compensation Act. After the briefing period for Corning's motion, the district court allowed additional time for limited discovery on the question whether running electrical power was a regular or recurrent part of Corning's business for purposes of exclusive remedy immunity and ordered the parties to submit supplemental briefs.

Following receipt of the parties' supplemental briefs, the district court found that the running of electrical power Dunn was performing when he was injured was a regular or recurrent part of Corning's business. Based on this finding, the district court concluded that Corning was immune from tort liability under Kentucky's Workers' Compensation Act and granted Corning's motion for summary judgment. Dunn appeals from the district court's grant of summary judgment. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291.

II

Kentucky Revised Statute (KRS) section 342.610(2)(b) defines a "contractor" as a person who contracts with another "[t]o have work performed of a kind which is a *regular or recurrent part* of the work of" that person's "trade, business, occupation, or profession" (emphasis added). If a premises owner qualifies as a contractor under this provision, then it is "deemed to be the statutory,

or 'up-the-ladder,' employer[] of individuals who are injured while working on" the premises. *Gen. Elec. Co. v. Cain*, 236 S.W.3d 579, 585 (Ky. 2007).

The purpose of up-the-ladder liability under KRS 342.610(2)(b) is "to discourage a contractor from subcontracting work that is a regular or recurrent part of its business to an irresponsible subcontractor in an attempt to avoid the expense of workers' compensation benefits." *Cain*, 236 S.W.3d at 585. "KRS 342.610(2)(b) accomplishes its purpose by viewing an *up-the-ladder* contractor as being the employer of an uninsured subcontractor's employees, *i.e.*, their statutory employer." *Doctors' Assocs., Inc. v. Uninsured Employers' Fund*, 364 S.W.3d 88, 91 (Ky. 2011). A statutory (or up-the-ladder) employer is liable for the injured worker's workers' compensation benefits (unless the direct employer already provided coverage) and may recover any amount paid (plus any expenses) from the subcontractor bearing primary liability as the injured worker's direct employer. *Id.* In addition, both the statutory employer and direct employer in this scenario are immune from tort liability for the work-related injury—an immunity often called "exclusive remedy immunity." *Id.*; *Cain*, 236 S.W.3d at 585. The "humane spirit of the statute," however, "does not warrant its extension beyond its legitimate scope." *Cain*, 236 S.W.3d at 587 (quoting *Gateway Constr. Co. v. Wallbaum*, 356 S.W.2d 247, 249 (Ky. 1962)).

Whether Corning is entitled to the exclusive remedy immunity it seeks therefore depends on whether Dunn "was injured while performing work that was 'of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession' of the owner." *Cain*, 236

No. 13-6582
*Dunn v. Corning, Inc.*

S.W.3d at 585. If so, Corning is immune from tort liability for Dunn's injuries. *Id.* If not, Corning is subject to tort liability.[1] *Id.*

The Kentucky Supreme Court has defined "regular or recurrent" work as "work that is customary, usual, normal, or performed repeatedly and that the business or a similar business would perform or be expected to perform with employees." *Id.* at 589. The test for whether work is regular or recurrent "is relative, not absolute." *Id.* at 588. Relevant factors include the business's size and scope, "as well whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform." *Id.* "Employees of contractors hired to perform routine repairs or maintenance that the owner or owners of similar businesses would normally be expected to handle with employees generally are viewed as being statutory employees." *Id.* Those hired to perform major or specialized construction or renovation projects, on the other hand, "generally are not a premises owner's statutory employees unless the owner or the owners of similar businesses would normally expect or be expected to handle such projects with employees." *Id.*

B

Corning's Harrodsburg plant is in the business of producing glass. The parties do not dispute that running electrical power, or running conduit, is a regular or recurrent part of this business. The parties split, however, over how narrowly they frame the work at issue. Dunn argues that Corning contracted with Comstock to supplement Corning's electrical employees to work on a major one-off

---

[1]It is undisputed that Comstock and Corning were each covered by workers' compensation insurance policies at the time of Dunn's injury.

expansion project that was not a part of Corning's regular or recurrent business. This alone, he argues, is enough for the Court to conclude that Corning is not entitled to exclusive remedy immunity, regardless of what specific task Dunn had been assigned to perform for the expansion project.

Corning, on the other hand, asks the Court to look more closely at the specific task Dunn was performing when he was injured. It argues that because Dunn was running conduit when he was injured, he was performing regular or recurrent work because Corning electricians ran conduit on a near-daily basis, regardless of the specific purpose for which the conduit was being run. In other words, Corning contends it would be improper to distinguish between running conduit for a large-scale expansion project and running conduit for regular and recurrent maintenance at the plant.

This Court recently explained "that our inquiry must focus on the actual work being performed at the time of the injury." *Estate of Dohoney ex rel. Dohoney v. Int'l Paper Co.*, 560 F. App'x 564, 569 (6th Cir. 2014). There, International Paper (IP) hired Konecranes, Dohoney's direct employer, to perform electrical work on IP's house crane during a regularly scheduled plant shutdown. *Id.* at 565. Dohoney was fatally electrocuted while attempting to repair the wiring on limit switches on the crane, which was one of several crane-maintenance tasks to which he was assigned. *Id.* Dohoney's widow argued that while Konecranes's general role at IP was crane maintenance and repair—itself a regular or recurrent part of IP's business—the limit-switch wiring Dohoney was performing at the time of his death in particular was neither regular nor recurrent work normally expected of IP employees. *Id.* at 569. This Court agreed, noting that the evidence showed

that IP itself engaged only in preventative maintenance and simple work, while Konecranes had been the exclusive repairer and maintainer of the house crane since 1996 and that limit-switch wiring replacement was not work IP normally would have done itself. *Id.* at 569–71.

While we recognize that *Estate of Dohoney* is unpublished, we find that case highly persuasive in its application of the Kentucky Supreme Court's decision in *General Electric Co. v. Cain*, 236 S.W.3d 579 (Ky. 2007). In *Cain*, James Rehm worked directly for Rapid Installation Company, which had contracted for several companies to perform millwright work where Rehm had possibly been exposed to asbestos. *Cain*, 236 S.W.3d at 590. The Kentucky Supreme Court applied its regular-or-recurrent test to each of the companies at which Rehm had performed contract work with Rapid, focusing on "the nature of the work that Rehm helped to perform for each [premises] owner." *Id.* at 592. In evaluating Rehm's claim against American Standard, Inc., the court in *Cain* noted Rehm's testimony that he "helped to tear out and re-route a conveyor in the foundry and repair or replace the conveyor's chain; he installed machinery in the faucet facility and connected the machinery as well as pipes, motors, and pumps to a conveyor; and he worked on the conveyor line that ran from the foundry into the enamel shop." *Id.* at 593. The court found that while "[t]here was substantial evidence that Rehm performed work that was regular or recurrent at American standard," there was "no substantial evidence [to show] that *all* of the work he performed was of a kind that American Standard or similar businesses would normally perform or be expected to perform with employees." *Id.* at 593–94 (emphasis added).

The court in *Cain* also considered Rehm's work at Goodrich Corporation, where Rehm testified that he removed and replaced machinery, pumps, motors, and pipes. *Id.* at 599. The evidence demonstrated that Goodrich had its own staff of unionized millwrights and other workers who performed day-to-day maintenance at the plant, and that it was Goodrich's policy to staff in-house employees on projects first and supplement with outside contractors on emergency work and major repairs. *Id.* at 599–600. The court concluded that the evidence "indicated that outside contractors were always working on capital projects at Goodrich, providing substantial evidence that such projects were regular or recurrent." *Id.* at 600. Nevertheless, the evidence failed to show that the project on which Rehm actually worked "was work of a kind that the company would normally expect or be expected to perform with employees rather than outside contractors." *Id.*

Thus, the court in *Cain* analyzed the specific projects Rehm had been assigned to perform at the various premises. *E.g.*, *id.* at 595 ("No evidence indicated that the project *on which Rehm worked* was significantly different from those that Brown–Forman employees performed." (emphasis added)). Here, the evidence establishes that Comstock—and thus Dunn—was hired specifically to run conduit for the Weigh/Mix 3 expansion.

Some aspects of the Weigh/Mix 3 expansion, and perhaps the expansion itself, viewed as a whole, may not have been a part of Corning's regular or recurrent business. We need not consider these issues to resolve this case, however, because the evidence does not demonstrate that Comstock was hired to perform, or that Dunn actually did perform, any part of that project other than running electrical power for the new mixer. The uncontroverted testimony in the record reveals that running

electrical power was a regular or recurrent part of Corning's business and that Dunn was performing the regular-or-recurrent task when he was injured.

Mark Hewlett, an electrical supervisor at the Harrodsburg plant, testified in his deposition that in April 2012, when Dunn was injured, Corning had contracted with Comstock to supply electricians for the Weigh/Mix 3 expansion and a rebuild of two production lines, 136 and 137. It is undisputed that Dunn was injured while running electrical conduit to the cullet crusher pit, and Hewlett testified that Corning electricians ran conduit at the Harrodsburg plant on a near-daily basis. He also testified that there was nothing unique about the conduit-running task Dunn had been performing just before his injury—that is, a Corning employee electrician could have performed the same task.

Ross similarly testified that running conduit "was a basic task performed daily by the electricians at the Corning facility," regardless of whether rebuilds or expansion projects were in progress. Ross testified that when rebuilds were in progress, Corning's electrical shop work—including running conduit—increased such that "Corning's electrical shop staff would be supplemented with outside contract industrial electricians of equal qualifications, to assist with the increased demands caused by the rebuild or expansion as well as the basic electrical work." Ross further testified that the running of conduit and electrical power Dunn was performing in the cullet crusher pit when he was injured "is the same type of work performed daily by the Corning electricians as part of the normal plant operations."

Importantly, Hewlett also testified that Corning electricians and contract electricians worked together to complete the Weigh/Mix 3 expansion, with the exception of the expansion's main power feed. Installing the main power feed, Hewlett explained, required outside expertise due to the high voltage involved. Ross, Hewlett's supervisor (whom Hewlett acknowledged would be most knowledgeable about the project, further explained that Corning had brought in Ready Electric, not Comstock, specifically to install the main power feed.

The record therefore discloses that Corning hired Comstock, Dunn's direct employer, to supplement Corning employees in performing regular and recurrent work at its Harrodsburg plant, while it hired Ready Electric to perform specialized work Corning employees would not be expected to perform themselves. At the time he was injured, Dunn was performing work that, but for the increased demand for electrical work at the Harrodsburg plant at the time, Corning's employee–electricians would have performed themselves. The record is silent regarding whether Corning employees or outside contractors, or both, completed the non-electrical aspects of the expansion or whether such projects would regularly or recurrently be performed by Corning employees. Absent such evidence, we cannot conclude that Dunn had been contracted to perform anything other than the regular and recurrent work of running conduit for Corning's Harrodsburg plant.

Finally, we note that our conclusion that Corning was a contractor with respect to Dunn pursuant to KRS 342.610(2)(b) accords with the statute's purpose. KRS 342.610(2)(b) is meant to deter premises owners from avoiding the expense of workers' compensation coverage by contracting

out work it normally would perform itself. *Cain*, 236 S.W.3d at 585. The record here does not establish that Corning contracted with Comstock for anything other than running electric power for the Weigh/Mix 3 expansion. It further reveals that Corning would have performed that aspect of the expansion with its own in-house electricians but for the increased demand for electricians at Corning's Harrodsburg plant at the time Corning contracted with Comstock. To hold Corning liable in tort for Dunn's injuries just because the plant's increased demand for electricians resulted from a broader, potentially irregular or nonrecurrent expansion project would impermissibly extend up-the-ladder liability beyond its legitimate scope.

## Conclusion

"Cases must be analyzed individually under KRS 342.610(2)(b) based on the particulars of the relationship at issue." *Doctors' Assocs.*, 364 S.W.3d at 92. The evidence in this case establishes that the relationship at issue here was limited to Corning's contracting with Comstock—for whom Dunn was employed—solely for Comstock to perform a regular and recurrent part of Corning's business: running electrical power (regardless of the broader purpose for that power). Dunn has submitted no evidence to demonstrate that Comstock was hired to perform any other task or that he was performing any other task. Under these circumstances, we conclude that Corning was an up-the-ladder statutory employer under Kentucky's Workers' Compensation Act. The district court therefore did not err in granting summary judgment in Corning's favor on the ground that it was entitled to exclusive remedy immunity from tort liability for Dunn's injuries.

No. 13-6582
*Dunn v. Corning, Inc.*

AFFIRMED.