**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0557n.06

**No. 16-2341**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| AMI STAMPING, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| ACE AMERICAN INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: COLE, Chief Judge; ROGERS and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

In this insurance contract dispute, the district court ruled that defendant ACE American Insurance Company was entitled to rescind plaintiff AMI Stamping, LLC's insurance policy because AMI made a material misrepresentation regarding property value at the time it applied for coverage. The district court granted summary judgment in favor of ACE. We affirm.

I.

AMI is a Michigan limited liability company. Because it has no employees, it transacts business through its chairman or the employees of affiliated company Revstone Industries, LLC. Revstone purchases insurance for itself and its affiliated entities through insurance agency Todd Associates, Inc. Spankie Carolanne, who is licensed to sell property and casualty insurance "with the State of Ohio," manages the Revstone account at Todd Associates. In that capacity,

she "obtain[s] insurance based on the risk characteristics . . . and the exposures that [her clients] have[.]" She also handles client calls and correspondence, produces insurance proposals and applications, "counsel[s] the insured when they have questions about insurance[,]" and "market[s] [insurance accounts] to various companies" when the policies come up for renewal.

In 2009, Revstone purchased a commercial properties policy from ACE issued by ACE's managing general agent Starr Technical Risks Agency, Inc.[1] The policy provided replacement cost coverage. The policy contained a Commercial Property Conditions provision that voided coverage if the insured "intentionally conceal[ed] or misrepresent[ed] a material fact concerning" the covered property. It also contained an Unintentional Errors and Omissions Endorsement providing that "[the] failure of the Insured to disclose all hazards existing as of the inception date of the Policy shall not prejudice the Insured with respect to the coverage afforded by this Policy" if the omission was unintentional. The policy was originally valid for a one-year term, but was renewed through January 18, 2012.

In early 2010, AMI acquired a security interest in a Detroit, Michigan building and in the equipment and machinery stored there. Revstone's assistant general counsel, Kiel Smith, contacted Carolanne to add AMI and its new assets to the existing Revstone policy. Carolanne asked Smith to provide, among other information, an "[a]ppraisal of the buildings and personal business property" in order "[t]o determine the proper insurance values to report to [ACE]."

In response, Smith sent Carolanne a document he described as an "[a]ppraisal of the equipment" that identified each piece, listed its value, and reported a total valuation of $138,100. Smith did not share any of the earlier appraisals done for AMI that placed significantly higher

---

[1]Starr was a named defendant in this action, but the parties stipulated to dismiss all claims against it on March 4, 2014.

values on the equipment in question.[2]  Carolanne then reached out to Vito Maniaci, an underwriter for Starr, and asked him to add the property to Revstone's policy.  She told Maniaci the building was valued at $1,920,000 and "the value of the personal property (per appraisal) is $138,100, which consists entirely of machinery and equipment."

ACE endorsed the Revstone policy effective February 11, 2010, adding AMI as an Additional Insured and the property to the schedule of insured locations for a pro-rata premium of $1,357.  ACE renewed coverage for a premium of $1,499.  At his deposition, Maniaci confirmed that he "relied on information from Carolanne," including information regarding asset values, in preparing the Revstone policy.  He clarified that the premium "depend[ed] on the value[]" of the property being insured.  At her deposition, Carolanne similarly stated that the premium "is based on a rate times the value of the property."

In early 2012, AMI discovered the equipment had been stolen.  Smith reported the loss to Carolanne.  A claims adjuster later contacted Smith on behalf of ACE to "finalize the claim" and confirm that "the exact amount you are claiming" was indeed $138,100.  Smith responded that it was not and, because the policy provided for payment of the equipment's replacement cost, he would be submitting a replacement cost valuation.

AMI commissioned an appraisal of the equipment's replacement cost value, which the appraiser concluded was $1,907,000.  AMI then submitted a proof of loss for that amount.  ACE declined to pay the claim, rescinded coverage, and refunded AMI its $2,856 in premiums paid.  ACE did so on the grounds that AMI misrepresented at the time of application that:  (1) the

---

[2]AMI was "aware" of these two 2006 appraisals when it purchased insurance for the equipment in 2010.  Although these appraisals include values for equipment and other property not at issue here, there is no dispute that they valued the relevant equipment at $385,450 (forced liquidation value), $415,300 (fair market value), and $462,800 (orderly liquidation value).

building had the required protective safeguards against fire and theft; and (2) the equipment was valued at $138,100.

AMI filed suit in Michigan state court, alleging that ACE breached the insurance contract by rescinding it. ACE removed, invoking diversity jurisdiction. The parties filed cross motions for summary judgment, and the district court ultimately granted judgment in favor of ACE. AMI timely appeals that ruling.

## II.

We review de novo a district court's decision to grant summary judgment. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the opposing party, *Rogers*, 737 F.3d at 1030, that party "has an affirmative duty [under Federal Rule of Civil Procedure 56(c)] to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007) (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).

## III.

ACE argues it was entitled to rescind because AMI misrepresented the equipment's value during the insurance application process. Because this is a diversity case, we apply Michigan substantive law, *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013), meaning we "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (internal quotation marks omitted). Michigan courts have long recognized that "[a] false representation in an application for

insurance which materially affects the acceptance of risk entitles the insurer to cancellation as a matter of law." *Gen. Am. Life Ins. Co. v Wojciechowski*, 22 N.W.2d 371, 374 (Mich. 1946); *see also Wiedmayer v. Midland Mut. Ins.*, 324 N.W.2d 752, 754–55 (Mich. 1982) (following *Wojciechowski*). "A misrepresentation on an insurance application is material if, given the correct information, the insurer would have rejected the risk or charged an increased premium." *Montgomery v. Fid. & Guar. Life Ins. Co.*, 713 N.W.2d 801, 803 (Mich. Ct. App. 2005).

Important here, "[r]ecission is justified *without regard* to the intentional nature of the [material] misrepresentation, as long as it is relied upon by the insurer." *Lakes State Ins. Co. v. Wilson*, 586 N.W.2d 113, 115 (Mich. Ct. App. 1998) (emphasis added). This is so even in cases of innocent misrepresentation "because otherwise the party responsible for the misstatement would be unjustly enriched if he were not held accountable for his misrepresentation." *Lash v. Allstate*, 532 N.W.2d 869, 872 (Mich. Ct. App. 1995); *see also 21st Century Premiere Ins. Co. v. Zufelt*, 889 N.W.2d 759, 764 (Mich. Ct. App. 2016). The rationale for Michigan's rule is obvious: the insurer, in making underwriting decisions and in setting premiums, has the right to rely on the information the insured provides as true and accurate. *See* 12A Appleman on Insurance Law & Practice § 7292 (2011).

## A.

We have little difficulty concluding these requirements are met here. Although AMI asserts it made no misrepresentation because Carolanne asked for an "appraisal" of the equipment's value and that is exactly what AMI provided, this argument ignores the importance of *accurate* valuations to an insurer's risk assessment and premium calculations. When Carolanne asked for an appraisal of the business personal property, she did so because ACE needed "the proper insurance values" to endorse the Revstone policy. Smith attached an

"[a]ppraisal of the equipment" to his response that reported a valuation of $138,100. That document does not specify what type of valuation the $138,100 figure represents, but as the district court aptly stated, it was a grossly inaccurate description of the equipment's value "by any measure."

Indeed, AMI admitted before the district court that its initial valuation was inaccurate, and concedes on appeal that Smith "made an honest mistake about the value of the property." ACE alleged in its counterclaim that AMI advised it on February 21, 2013, "that the $138,100 valuation . . . was incorrect." AMI did not deny this allegation in its answer, admitting "that it provided additional information to ACE regarding the value of the property." Pursuant to Federal Rule of Civil Procedure 8(b)(6), "[a]n allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied." The district court did not clearly err in deeming this allegation admitted. *See Himes v. United States*, 645 F.3d 771, 776 (6th Cir. 2011) (reviewing factual findings for clear error).

AMI's admission makes sense. When it applied for coverage in 2010, AMI had two other appraisals from 2006 in its records showing much higher orderly liquidation ($462,800), forced liquidation ($385,450), and fair market ($415,300) values for the equipment. After an adjuster informed AMI that ACE was "ready to finalize the claim" and sought to confirm $138,100 as the loss amount, AMI commissioned yet another appraisal rather than settle its claim based on the original valuation. AMI then submitted proof of loss based on that latest appraisal's replacement-cost-value determination of $1.9 million—an amount nearly *fourteen times* the valuation AMI submitted only three years earlier and upon which its premium was based. The $138,100 value was significantly lower than those calculated under the four valuation methods the three other appraisals used.

The significant disparity between the coverage amount AMI bargained for and the loss amount it submitted lends further support to the conclusion that the $138,100 figure inaccurately represented the equipment's value "by any measure." AMI argues defendant never specified that the appraisal should reflect a replacement cost value, but it applied for coverage under an *existing* replacement cost policy. Moreover, AMI presents no evidence that Maniaci or Carolanne were aware of the 2006 appraisals or had any other reason to suspect that $138,100 did not reflect the equipment's replacement cost or was otherwise an inaccurate valuation.[3] Defendant rightfully expected AMI to provide an accurate valuation of its own property. That AMI's misrepresentation of that value may have been an innocent one made by "a young attorney [who] was unaware that different types of valuation existed" is of no consequence under Michigan law. *See Lakes State Ins. Co.*, 586 N.W.2d at 115.

Maniaci's and Carolanne's unrebutted deposition testimony establishes both the materiality of AMI's misrepresentation and defendant's reliance on it in calculating the appropriate premium to charge. As to ACE's reliance, Maniaci expressly stated he relied on the property value information Carolanne gave him when he prepared the Revstone policy. These values, Maniaci emphasized, "are supplied by the insured through the broker." Their accuracy is crucial because, as both Maniaci and Carolanne explained, the premium for the type of coverage AMI bought is based on the value of the property to be insured. Thus, as to materiality, had ACE known from the outset that AMI valued the equipment at approximately $1.9 million, or at

---

[3]Maniaci's and Carolanne's testimony on this point is unrebutted. Because the Revstone policy was a replacement cost policy, and in light of his prior discussions with Carolanne about this type of policy, Maniaci testified at his deposition that he assumed the asset value information she provided him reflected its replacement cost. For her part, Carolanne testified she knew ACE typically requested replacement cost values for property to be insured.

any of the values from either 2006 appraisal, it would have charged AMI more than $1,499 a year to insure the property. AMI identifies no record evidence suggesting otherwise.

B.

AMI raises two counterarguments instead. Neither persuades.

*Carolanne's agency status.* First, AMI asserts no misrepresentation can be attributed to it because Carolanne was not acting as its agent when she communicated the valuation to ACE— she was ACE's agent. AMI's position conflicts with that taken in its answer to defendant's counterclaim, where it referred to Carolanne as "its agent" and "insurance broker." That aside, under Michigan law, she was AMI's agent at all relevant times.

In her deposition, Carolanne described herself as an "independent agent" and Revstone as a "client." In Michigan, "when an insurance policy is facilitated by an independent insurance agent or broker, [that individual] is considered an agent of the insured rather than an agent of the insurer." *Stone v. Auto-Owners Ins. Co.*, 858 N.W.2d 765, 772 (Mich. Ct. App. 2014) (internal quotation marks omitted). An insurance agent is "independent" if she has "the power to place insurance with various insurance companies." *Harwood v. Auto-Owners Ins. Co*., 535 N.W.2d 207, 209 (Mich. Ct. App. 1995).

Carolanne's unrebutted deposition testimony makes clear that she shopped her client's insurance policies to "various companies" at renewal as part of her duties, and that she shopped the Revstone account specifically to at least seven insurers. "Testimony that an agency deals with numerous insurance companies is generally sufficient to prove that the independent agent is an agent of the insured and not of the insurer." *Estate of Morse ex rel. Morse v. Titan Ins. Co*.,

Docket No. 309837, 2014 WL 3971438, at *4 (Mich. Ct. App. 2014). Michigan law provides no support for AMI's contention that Carolanne was ACE's agent.[4]

To avoid this unfavorable result, AMI posits that Ohio law should govern the question of Carolanne's agency status instead because she is licensed in Ohio and her office is located there. The district court rejected that argument, a determination we review de novo. *Wahl v. Gen. Elec. Co.*, 786 F.3d 491, 493 (6th Cir. 2015); *see also Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991). We find that the district court did not reversibly err.

As a threshold matter, the parties do not dispute that Michigan law governs the policy. Moreover, AMI cites no authority for its proposition that, under the facts of this case, Ohio law governs the issue of who Carolanne represented in that transaction. Nor does AMI engage in any meaningful choice-of-law analysis. Because this is a diversity action, Michigan's choice-of-law rules apply, *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 389 (6th Cir. 2017), and Michigan courts generally look to the Restatement (Second) of Conflict of Laws in resolving such questions. *See Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 (Mich. 1995).

The Second Restatement explains that "the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction" determines "[t]he rights and duties of a principal and agent toward each other." Restatement

---

[4]Carolanne also testified she was the "authorized representative" of ACE. AMI takes this to mean that she was ACE's agent. But this authorization did not include the authority to bind ACE to a contract. *See In re Estate of Capuzzi*, 684 N.W.2d 677, 679 (Mich. 2004) ("longstanding legal principle that a duly authorized agent has the power to act and bind the principal to the same extent as if the principal acted."). Moreover, Carolanne explained that "an independent agent" was "an authorized representative" of every insurer he or she placed insurance with. As an independent agent who could place insurance with various companies, she was AMI's agent under Michigan law.

(Second) Conflict of Laws § 291 (1971). The Second Restatement directs us to consider five "contacts" in deciding which state has such a relationship "in the absence of an effective choice of law by the parties." *Id.* § 188(2). These contacts include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*

Of these contacts, only the "place of negotiation of the contract" arguably points to Ohio. The parties to the transaction, of which Carolanne was not one, are domiciled in Pennsylvania (ACE) and Michigan (AMI). Starr is a New York corporation, and Maniaci executed the policy endorsement in Illinois. The building and equipment AMI insured was located in Michigan, where the theft occurred. Although Smith initially reported the loss to Carolanne, she was not involved in the claims process. The property adjuster who did administer AMI's claim was located in Michigan, while Starr's general adjuster was located in Texas.

Carolanne was licensed and worked in Ohio, but her relationship to the parties and the transaction was simply to facilitate the deal—she had no ongoing involvement in its performance. That said, "the particular issue" at hand is whether she was AMI's or ACE's agent while performing her duties in Ohio, not which state's law should govern a court's interpretation of the policy. *See* Restatement (Second) Conflict of Laws § 291 (1971). But even if Ohio law should govern the issue, AMI does not explain *why* the question of Carolanne's agency status is relevant here given that *AMI* was the source of the misrepresentation and AMI identifies no evidence that Carolanne knew or should have known that the valuation Smith provided was inaccurate. AMI cites no authority, and we find none, for the proposition that because it

communicated an inaccurate property value to its insurer indirectly, AMI cannot be held to account for that misrepresentation.

Finally, AMI's reliance on a producer agreement between Todd Associates and ACE as evidence of Carolanne's status as ACE's agent is misplaced. That agreement did not become effective until June 1, 2010, several months *after* AMI applied for insurance in February 2010. Furthermore, the agreement applies to accident and health insurance only, not property insurance. AMI counters that regardless of the agreement's effective date or scope, Carolanne was ACE's agent because she "behaved" like ACE's agent. However, AMI does not articulate how nor provide specific examples of this "behav[ior]." At bottom, the district court did not reversibly err in holding AMI to account for the misrepresentation *it* made to ACE through Carolanne.

*Policy provisions.* AMI also relies on two policy provisions for relief, arguing they bar defendant from rescinding the policy. Under Michigan law, "[a]n insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992). "[T]he construction and interpretation of an insurance contract is a question of law for a court to determine[.]" *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999).

AMI first notes how the Unintentional Errors and Omissions Endorsement provides that the insured will not be "prejudice[d] . . . with respect to [coverage]" if it unintentionally fails to "disclose all hazards existing as of the inception date." Yet this endorsement does not forgive an innocent misrepresentation of property *value*, but rather an innocent failure to disclose a *hazard*. On its face, this endorsement has no applicability here.

Next, AMI points to the policy's Commercial Property Conditions provision. That provision voids coverage if the insured *intentionally* "conceal[s] or misrepresent[s] a material fact concerning . . . The Covered Property[.]" According to AMI, this provision necessarily operates as a waiver of defendant's common law right to rescind coverage for *unintentional* misrepresentations. On appeal, AMI takes issue with the district court's reliance on *Seneca Specialty Ins. Co. v. W. Chicago Prop. Co., LLC*, No. 08-12335, 2010 WL 431734 (E.D. Mich. Feb. 2, 2010) in rejecting that argument.

We find no flaw in the district court's analysis. In *Seneca Specialty*, the district court applied Michigan law and rejected the same argument AMI makes here "because [the insurer's] right to void the contract *ab initio* in cases of unintentional misrepresentations exists completely separate from the terms of the contract itself." *Id.* at *2. The district court in this case agreed, correctly noting that Michigan law requires a waiver of a known right to be voluntary and intentional. *See Sweebe v. Sweebe*, 712 N.W.2d 708, 712 (Mich. 2006); *see also Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003). AMI specifies no evidence that ACE intended to waive its right under Michigan common law to rescind coverage based on an innocent, material misrepresentation—and a "waiver cannot be inferred by mere silence." *Moore v. First Sec. Cas. Co.*, 568 N.W.2d 841, 844 (Mich. Ct. App. 1997).

AMI's only argument is that *Seneca Specialty* does not apply because AMI never made any misrepresentation in the first instance, innocent or otherwise. But AMI concedes that if it "had made an unintentional [mis]representation, *Seneca Specialty* would support the District Court's contention that contract provisions regarding misrepresentations do not operate as a waiver of common law rights regarding rescission." We agree and conclude that AMI has not established a genuine dispute of material fact that it made a material misrepresentation in

applying for insurance coverage upon which defendant relied. Accordingly, ACE was entitled to rescind the policy as a matter of law regardless of whether AMI's misrepresentation was innocent or intentional.

IV.

For these reasons, we affirm the district court's judgment.